OPINION OF THE COURT
Fuchsberg, J.
Today this court reaffirms the established New York rule that one who acts solely as the agent of a purchaser of narcotics cannot be convicted of the crime of criminal sale of a controlled substance. Having thus determined that the abolition of that defense would be an unwarranted departure from the decisional law of this State, we must decide in the present case whether, under a reasonable view of the evidence adduced at trial, the jury should have been charged on that question.
The proof in this case, essentially undisputed, was garnered by an undercover police officer, Sylvio Lugo, who struck up a friendship with the defendant, Antonio Roche, after initially encountering him as a fellow patron at various bars. In the course of one of their later meetings, Lugo mentioned that he was interested in making a purchase of narcotics. Roche indicated that he might be of assistance in doing so and invited Lugo to telephone him for that purpose if he so desired. After Lugo’s subsequent attempts to follow up were unsuccessful, he sought out Roche at a bar and advised him that he had indeed decided to buy cocaine or heroin. In the course of this conversation, he told Roche that he had in mind an "eighth” (approximately four ounces); Roche estimated the cost of such a quantity at between three and four thousand dollars, depending on its quality and who the seller was.
It was not, however, until the better part of two months had gone by that Lugo telephoned Roche to tell him that he was in a hurry to make an immediate purchase. From The Bronx, where they then met at Roche’s request, they proceeded at the latter’s direction to Les Nannettes Bar in Manhattan, using Lugo’s car. There Roche entered the premises alone, presumably to "see the man” who was the seller. Upon returning to Lugo, who had been waiting in the car, he reported that things had been arranged and that the price would be $4,000. Lugo thereupon handed that sum in cash to Roche who, again alone, re-entered Les Nanettes with it and in a few minutes *82 was back to advise Lugo that the actual delivery of the drugs would take place at a discotheque called the Cheetah.
At the Cheetah, Lugo remained in an upstairs bar area while Roche went to the floor below. As he waited, Lugo observed a shabbily dressed man enter the lower level of the premises with a newspaper under his arm. From Lugo’s vantage point, he was able to observe this man remove a white paper bag from the folds of the newspaper and hand it to Roche, who placed it in his waistband. Roche then walked upstairs and, in turn, gave the package to Lugo. Police analysis was to reveal it contained heroin.
About 10 days later, Lugo in the course of a telephone conversation with Roche, complained about the quality of the narcotics. Roche chided Lugo for not having said something about it earlier. The record does not indicate that there was any request or suggestion for adjustment.
Roche was subsequently indicted for criminal sale of a controlled substance in the first degree (Penal Law, § 220.43) and criminal possession of a controlled substance in the first degree (Penal Law, § 220.21). At nisi prius, defense counsel’s request for an instruction on agency was denied, the trial court ruling that there was no evidence to support such a contention. A divided Appellate Division, finding that there was such proof, modified by reversing the conviction for criminal sale and directing a new trial on that count; it affirmed the conviction for criminal possession. The case is now here on cross appeals. On this record, we believe the Appellate Division’s determination should be upheld.
As noted in People v Sierra (45 NY2d 56), People v Lam Lek Chong (45 NY2d 64) and People v Argibay (45 NY2d 45), the underlying theory of the agency defense in drug cases is that one who acts as procuring agent for the buyer alone is a principal or conspirator in the purchase rather than the sale of the contraband.[1] Since the thrust of our statutes, as consist *83 ently construed, is not directed against purchasers, an individual who participates in such a transaction solely to assist a buyer and only on his behalf, incurs no greater criminal liability than does the purchaser he aids and from whom his entire standing in the transaction is derived. Specifically, without more he may not be treated as an accomplice of the seller (see People v Pasquarello, 282 App Div 405, affd 306 NY 759; see, also, People v Catterall, 5 Wash App 373; 23 CJS, Criminal Law, § 798 [16], [18], [20]). Of course, such a role is not to be confused with that of a middleman — be he a jobber or any other category of merchant trading in narcotics, or a broker furthering his own interests by serving both seller and buyer — who thus essentially acts for himself rather than merely as an extension of the buyer (People v Argibay, supra, p 53).
Concededly, the introduction of the term "agency” into the lexicon of the law governing drug prosecutions at most carries with it limited application of concepts which govern its use in defining relationships and responsibilities more characteristic of the world of commerce and property (People v Argibay, supra, p 53). Blunt acknowledgement of that fact would lessen consequent confusion. As a practical matter, it lends an element of flexibility to the resolution, by Judge or jury, of the relationship to a particular drug transaction of certain of the wide variety of participants who do not neatly fit into the mold of buyer or seller. These range along a spectrum reaching all the way from those whose predatory and profit-laden motives spell out the unmistakably dominant parts they play in such transactions, to those at the far end — who may include persons as diverse as impressionable students, victims of contributing socioeconomic or medical problems, and others who have been seduced by exposure to drugs to fall into a state of dependency on them.
It is therefore not to be assumed that all those who engage in procurement of illegal drugs are motivated by a criminal disposition rather than a desire to satisfy a personal craving to feed an irresistible habit or to aid one so afflicted. Thus, the "agency defense” in good part may be seen as a common-law attempt, in appropriate cases, to recognize the existence of medical and sociological aspects which complicate the factual *84 setting within which the nature of a particular defendant’s participation is to be determined.
Perhaps it was out of a recognition of this problem that, just as it has chosen to leave the act of buying drugs unprohibited by the criminal law, the Legislature has also left the agency defense inviolate. Given the accelerated and massive legislative attention that the narcotics laws have received within the last decade, and the fact that our Legislature has chosen to punish drug trafficking more severely than has any other jurisdiction[2] (People v Broadie, 37 NY2d 100, 116, cert den 423 US 950; Carmona v Ward, 576 F2d 405 [Oakes, J., dissenting]), we must assume that its acceptance of the defense represents a calculated and ameliorative judgment not to impose such penalties upon a person who merely facilitates the acquisition of drugs by a purchaser (People v Chong, supra, p 74).
Moreover, the agency defense rarely, if ever, is credited by the fact finder in the predator case. Not surprisingly, examination of the existent literature on drug prosecutions discloses no suggestion that the assertion of that defense in such profit-laden circumstances leads to any noticable number of acquittals.
This does not mean that the agency defense is a broad *85 brush to be laid on indiscriminately. It goes without saying that, in order to fall within its sweep, the agent must have no direct interest in the contraband being sold. His function must be performed without any profit motive (compare People v Wright, 20 AD2d 652, affd 15 NY2d 555, with People v Lindsey, 16 AD2d 805, affd 12 NY2d 958). If he is in fact interested in the outcome, either by ownership of the property or by an agency relationship with the seller, he fails, by definition, to be an agent for the purchaser (see People v Chong, supra; People v Argibay, supra).
Where the defense is raised, it is incumbent to focus on the parties’ conduct during the transaction. Salesman-like behavior, commonly connoting an interest that goes beyond representation of the buyer alone, may include touting the quality of the product (see United States v Smith, 452 F2d 404; cf. United States v Johnson, 371 F2d 800, 806-807), bargaining over price (United States v Winfield, 341 F2d 70, 71; cf. People v Harris, 24 NY2d 810) and apologizing for the quality of drugs or the manner of their delivery (United States v Winfield, supra, p 71). Previous acquaintance with the supplier, or with narcotics in general, though of lesser import, may also be taken into account (cf. People v Jenkins, 41 NY2d 307, 312; People v Bucher, 30 NY2d 708; People v Hingerton, 26 NY2d 790).
On the other hand, the fact that an accused advances no funds of his own in making a purchase for another may militate against a finding that he is a principal (see Vasquez v United States, 290 F2d 897, 898). Though evidence that he was simply doing a favor for a friend may also suggest an agency, he still may be found to have participated in selling if his actions were undertaken with the paramount idea that he would profit thereby (see People v Wright, 20 AD2d 652, affd 15 NY2d 555, supra; United States v Smith, 452 F2d 404, supra).
This is not to say, however, that the acceptance of any benefit must preclude the assertion of the defense as a matter of law. That an agent does not act gratuitously would not necessarily be inconsistent with the defense of agency (People v Valentine, 55 AD2d 585; People v Bostick, 51 AD2d 749; People v Johnson, 47 AD2d 897; People v Fortes, 24 AD2d 428, app dsmd 17 NY2d 583).
Although often raised together with entrapment (e.g., United States v Barcella, 432 F2d 570, 572; United States v *86 Sawyer, 210 F2d 169; Note, 22 Kan L Rev 272, 276), agency is not an affirmative defense (Lewis v United States, 337 F2d 541, 543, n 4 [Burger, J.], cert den 381 US 920; contra, People v Fuller, 34 AD2d 852). Rather, it may negate the existence of an essential element of the crime — the "sale” (Lewis v United States, supra, p 543, n 4).
It follows that, so long as there is some reasonable view of the evidence that the defendant acted as a mere instrumentality of the buyer, determination of the existence of an agency relationship should be submitted to the jury with appropriate instructions (People v Argibay, supra, p 53; see, also, People v Carr, 41 NY2d 847, revg on dissent at 49 AD2d 656, 657; Lewis v United States, 337 F2d 541, supra; Kelley v United States, 275 F2d 10; cf. People v Henderson, 41 NY2d 233).
Applying that yardstick here, it is apparent that there was an issue of fact on the question of agency. The course of negotiations was such that Roche could well have been found not to have shared the role of principal in the transaction. At no time did he suggest the purchase or press for it. It was Lugo who pursued their relationship and initiated their conversations about drugs. Nonentrepreneur like, despite Lugo’s evincing a desire to make a purchase, Roche apparently never brought the subject up again; it remained for Lugo to do so, nearly two months later.
Though Roche expressed an opinion as to what he thought would be the cost of the quantity of drugs Lugo desired to buy, so far as the proof indicates it may not have been until after he entered Les Nannettes to see "the man” that he was able to inform Lugo how much it actually was. Nor is there an iota of proof, by way of admission or otherwise, of any material benefit received by Roche at any time; the record is barren of evidence of how the proceeds of the purchase were disposed of other than as described by Roche himself.
Moreover, it may be significant that Lugo was not dependent upon Roche’s own statements that the supplier of the drugs was a third party; the observations it was his duty as an officer to make enabled him to witness the delivery itself. And when Lugo later mentioned to Roche that the heroin was of poor quality, the tape that recorded the conversation discloses not the slightest expression of an obligation to explain or undertake to remedy this shortcoming nor did Lugo appear to expect any.
*87 True it is that Roche was no stranger to drugs, to their prices and to persons involved in. their traffic, but no matter what suspicions that fact might very well engender it could hardly be conclusive, since that no doubt is the prime qualification a prospective buyer would look for in choosing an intermediary.
 The defense having thus squarely presented the issue of agency, the jury should have been instructed on the applicable law under which it could decide whether Roche enjoyed the status of agent. But, with respect to the conviction of criminal possession of a controlled substance, first degree, since agency would not be a defense (People v Sierra, 45 NY2d 56, supra) and the evidence establishes that Roche, however transitorily, was knowingly in possession of the heroin, the conviction on that count must stand.
Accordingly, the order of the Appellate Division should be affirmed.

.The defense is not indigenous to New York alone. A clear majority of those of our sister States who have addressed the matter have adopted it (People v Fenninger, — Col —, 552 P2d 1018; Dent v State, 301 So 2d 475 [Fla] [semble]; State v Lott, 255 NW2d 105 [Iowa]; State v Osburn, 211 Kan 248; Kohler v Commonwealth, 492 SW2d 198 [Ky] [semble]; Snead v State, 234 Md 63; Commonwealth v Harvard, 356 Mass 452; Roy v State, 87 Nev 517; Jones v State, 481 P2d 169 [Okla]; State v Buchanan, 8 Ore 150 [semble]; Commonwealth v Simione, 447 Pa 473; Smith v State, 396 SW2d 876 [Tex]; State v Schultz, 28 Utah 2d 240; State v Catterall, 5 Wash App 373; see, also, United States v Stewart, 20 USCMA 300; contra, McKay v State, 489 P2d 145 [Alaska]; State v Russell, 108 Ariz 549; Granville v State, 287 A2d 652 [Del]; Brooks v *83 State, 125 Ga App 867, cert den 409 US 1129; People v Shannon, 15 Ill 2d 494; State v Stone, 114 NH 114; State v Weissman, 73 NJ Super 274; State v Dwyer, 172 NW2d 591 [ND]; Higby v State, 485 P2d 380 [Wyo]).

.In so indicating, the court, as at the time of our decision in People v Broadie, 37 NY2d 100, 118, supra, does not pass on the wisdom of the Legislature’s judgment. We note, however, that the intervening three years do not appear to have undermined the validity of Chief Judge Breitel’s observation that the "pragmatic value [of these penalties] might well be questioned, since more than a half century of increasingly severe sanctions has failed to stem, if indeed it has not caused, a parallel crescendo of drug abuse. The premises upon which the Legislature has proceeded have been subjected to vigorous dispute (see, e.g., United States v Moore, 486 F2d 1139, 1243-1246 [Wright, J., dissenting], supra; Report of the President’s Advisory Comm, on Narcotic and Drug Abuse, pp 3, 40; Drug Use in America, op. cit., pp 250-251; Rosenthal, Proposals for Dangerous Drug Legislation, Task Force on Narcotics and Drug Abuse, op. cit., pp 80, 103; Chambliss, Types of Deviance and the Effectiveness of Legal Sanctions, 1967 Wis L Rev 703, 707-708; Frankel, Narcotic Addiction, Criminal Responsibility and Civil Commitment, 1966 Utah L Rev 581, 587-588). Indeed, the debate moves beyond the wisdom of substituting long mandatory prison terms in place of flexible sentencing, of emphasizing isolation and deterrence over rehabilitation. Even the questions whether 'the policy of criminalization, which raises the cost and increases the difficulty of obtaining drugs, does in fact make the drug user a proselytizer of others in order that he may obtain the funds to acquire his own drugs’, and whether 'the compulsion of the addict to obtain drugs and the moneys to purchase them causes him to commit collateral crime that otherwise he might not commit’, are questions about which reasonable men can and do differ [citations omitted]”.