THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FELIX COLON, JR., Appellant.

First Department, November 2, 1989

## APPEARANCES OF COUNSEL

*Richard L. Kellner* of counsel *(Billie Manning* with him on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

*Jay Shapiro* for appellant.

## OPINION OF THE COURT

Ross, J.

Defendant appeals from a judgment, which convicted him of two sales of controlled substances. Before us, he contends that the trial court committed reversible error, in that, *inter alia,* it submitted a redacted portion of the transcript of testimony of a witness to the jury, for use during deliberations; and, it permitted testimony about a sale of heroin made by defendant's wife, which was not charged in the indictment.

By indictment, number 3868, filed November 7, 1983, a Bronx Grand Jury charged that defendant and Mr. Eric Vega, also known as Eddie Vega DeJesus, "while aiding each other", committed the crimes of criminal sale of a controlled substance in the first degree (Penal Law § 220.43), criminal sale of a controlled substance in the second degree (Penal Law § 220.41), criminal sale of a controlled substance in the third

degree (Penal Law § 220.39) (two counts), criminal possession of a controlled substance in the second degree (Penal Law § 220.18), criminal possession of a controlled substance in the third degree (Penal Law § 220.16) (five counts), and criminal possession of a controlled substance in the fourth degree (Penal Law § 220.09). Subsequently, in November 1984, defendant and his codefendant, Mr. DeJesus, were jointly tried.

At trial, the only testimony was presented by the People's witnesses, since neither defendant nor Mr. DeJesus presented any witness testimony.

The testimony of the People's witnesses at trial indicates, in substance, as follows:

In the spring of 1983, as a result of information received from a confidential informant, which indicated that defendant was engaged in the illegal sale of controlled substances, police officers assigned to the Bronx County Narcotic Squad (Squad) commenced an investigation.

On the afternoon of May 25, 1983, the confidential informant brought undercover Detective Charles Serrano (Detective Serrano), who was assigned to the Squad, to apartment 1-C, located in 282 Brook Avenue, Bronx County, which was the defendant's residence, in order that the detective could buy drugs from the defendant. Although, on this occasion, Detective Serrano was unable to meet defendant, since defendant's wife stated defendant was asleep, he did negotiate with the defendant's wife for the purchase of 20 glassine envelopes of heroin. Thereafter, while defendant's wife peered out of the front door of the apartment, Detective Serrano entered the adjacent hallway, and received the subject drugs from a person named "Soaky". Upon leaving that day, Detective Serrano told defendant's wife that "if the merchandise was good, I would be back".

Subsequently, over the course of the month of June 1983, Detective Serrano testified he met, at least seven times, with defendant, in the apartment, mentioned *supra*, to negotiate the purchase of drugs. In pertinent part, Detective Serrano testified he informed defendant that his name was "Nicky" and "that I was coming from Connecticut [and] I had my own operation in the narcotic trade and that I was trying to find myself a good connection to supply me with the merchandise that I needed".

Furthermore, Detective Serrano testified that, on June 28, 1983, when he told defendant he needed cocaine and heroin,

the defendant "said that he was going to * * * hook [Detective Serrano] up with one of his cousins that was in the business". Pursuant to defendant's offer, Detective Serrano and the defendant agreed to meet the next day.

Shortly after 12:05 P.M., on June 29, 1983, Detective Serrano met with defendant in the Brook Avenue apartment, and defendant told the undercover officer he had arranged the drug deal, but he still had to make a few telephone calls. At approximately 3:00 P.M., they left that apartment, and Detective Serrano drove defendant, in the officer's Volkswagen, to Faile Street, in the Hunts Point area, where they unsuccessfully looked for a person named Mr. Lucho, who was one of the defendant's drug connections. Thereafter, for approximately 45 minutes, they drove to a number of different locations, until, at approximately 3:45 P.M., they parked in front of 1580 Theriot Avenue.

Within a few minutes, when a black car parked nearby, the defendant informed Detective Serrano "that's my cousin", and exited the undercover officer's car in order to speak to his cousin. After speaking with his cousin, defendant returned to inform Detective Serrano that he had to accompany his cousin to pick up an automobile, which the cousin had just purchased, and defendant then left the scene in the black car while Detective Serrano waited in his own car. Sometime later, Detective Serrano observed the defendant return to the scene, driving the black car, and defendant was following a gold colored car, with two people in it. Subsequent to the black and gold cars parking, defendant introduced Detective Serrano to his cousin "Eddie", who was codefendant, Mr. DeJesus.

After some small talk between the undercover officer and Mr. DeJesus about Mr. DeJesus' new car, Detective Serrano testified: "I told [defendant and Mr. DeJesus] that I wanted to take care of business. It was getting a little late. He [defendant] said, 'All right,' and he spoke to [Mr. DeJesus] and then they walked inside [1580 Theriot Avenue]." The undercover officer returned to his car and waited. Shortly afterwards, defendant emerged from that building, came over to the undercover officer's car, and showed Detective Serrano a sample of cocaine, which defendant stated was being sold by Mr. DeJesus. In response, Detective Serrano told defendant that he wanted one ounce of cocaine and six grams of heroin. Thereafter, defendant went back into the building, mentioned *supra.*

Sometime later, defendant and Mr. DeJesus came out of that building, and while defendant entered the undercover officer's car, Mr. DeJesus entered the gold car. Thereafter, these cars were driven to the vicinity of 1571 Leland Avenue, where they parked.

Subsequently, the undercover officer and defendant entered the gold car. In that car, Detective Serrano testified that he negotiated the purchase of a quantity of cocaine and heroin, and in exchange for packages, which contained seven eighths of an ounce of cocaine and over one eighth of an ounce of heroin, Detective Serrano gave Mr. DeJesus $3,850. Both defendant and Mr. DeJesus handled the drugs during this June 29th transaction.

Following the June drug sale, during the second week of August 1983, the undercover officer negotiated with defendant the purchase of three ounces of cocaine, and the defendant stated the price would be between $5,000 and $6,000. This sale was to take place on August 13, 1983. On that day, at about 12:45 P.M., Detective Serrano arrived at defendant's Brook Avenue apartment, where the undercover officer waited until approximately 2:35 P.M., when he and defendant left that apartment and traveled, in Detective Serrano's car, to 1106 West Farms Road. At this location, they waited, for about two hours, and then they drove to 634 Manida Avenue, where defendant exited the undercover officer's car and met Mr. DeJesus in the street. Thereafter, defendant and Mr. DeJesus entered 634 Manida Avenue, and in a short while, they emerged from that building. Now, they instructed Detective Serrano to drive his car and follow the gold car, mentioned *supra,* which the defendant and Mr. DeJesus entered, to Barretto Street Park (park).

After their arrival, the undercover officer, defendant, and Mr. DeJesus exited their respective cars, went into the park, and sat down together on a bench. While in that location, defendant took out a package of cocaine, which he handed to Mr. DeJesus, who, in turn, gave it to the undercover officer. As soon as the undercover officer completed his examination of that package, he returned it to Mr. DeJesus. Furthermore, Detective Serrano testified that he told defendant and Mr. DeJesus that he would soon need a kilogram of cocaine, and that, while the cocaine purchased in June was of good quality, the heroin did not meet his standards. Mr. DeJesus assured the undercover officer that he would provide a better quality of heroin, and that they would do more business in the future.

The August 13th sale was concluded, in Detective Serrano's car, when the undercover officer gave Mr. DeJesus $5,400 in exchange for a package, which contained over 2⅞ of an ounce of cocaine.

On October 12, 1983, defendant was arrested in front of his Brook Avenue apartment, and on October 22, 1983, Mr. DeJesus was arrested.

Upon the basis of the evidence presented, the jury convicted defendant and Mr. DeJesus of the crimes of criminal sales of controlled substances in the first and second degree.

On appeal, defendant contends that the trial court committed reversible error when it submitted to the jury, for use during its deliberations, a redacted transcript of a portion of the trial testimony of Detective Serrano, who was the undercover officer. In substance, defendant claims that this action of the trial court deprived him of his right to be present at all material portions of the trial, as provided by CPL 310.30.

CPL 310.30 reads:

"Jury deliberation; request for information

"At any time during its deliberation, the jury may request the court for further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case. Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper. With the consent of the parties and upon the request of the jury for further instruction with respect to a statute, the court may also give to the jury copies of the text of any statute which, in its discretion, the court deems proper."

The Court of Appeals held, in *People v Mehmedi* (69 NY2d 759, 760 [1987], *rearg denied* 69 NY2d 985 [1987]), that under the provisions of CPL 310.30, "[a] defendant has a fundamental right to be present at all material stages of a trial".

Judgments of conviction have been reversed, upon the basis that defendant's right to be present at all material stages of a trial was violated, where a trial court, without recalling the jury to the courtroom, and in the absence of the defendant, instructed the court clerk to, in substance, read certain testimony, requested by the jury, and after having done so, the "Clerk then imparted it, in paraphrase, to a court attendant

who, in turn, relayed it to the jury" *(People v Tyler,* 14 AD2d 609, 610 [1961]); and, where a trial court, *sua sponte,* provided a jury with a written portion of the charge, for use during deliberations *(People v Owens,* 69 NY2d 585 [1987]; *also see, People v Nimmons,* 72 NY2d 830 [1988]).

Furthermore, the Court of Appeals in *People v Lourido* (70 NY2d 428 [1987]), found a trial court committed reversible error, where, in a case involving an alleged sexual assault on the victim, it failed, over a period of three hours, to satisfy the jury's request, during deliberations, for a readback of the victim's cross-examination, and then accepted a verdict, without inquiry, as to whether that unsatisfied request had any continuing relevance for the jury. In pertinent part, the court stated in *People v Lourido (supra,* at 435), "In this case, the court's response was not meaningful because it was no response at all. It seriously prejudiced the defendant" *(also see, People v Hamilton,* 140 AD2d 1001 [1988]).

Our examination of the trial transcript of the subject trial indicates it contains almost 1,300 pages, and about one third, or approximately 400 pages, consists of the testimony of Detective Serrano.

During deliberations, the jury first asked the trial court for a portion of Detective Serrano's testimony, and the court directed a readback in the presence of defendant and his counsel.

Thereafter, the jury requested the entire testimony of Detective Serrano. In response to the jury's request, the experienced trial court, in lieu of a readback of approximately 400 pages, consulted with counsel, who participated in redacting all irrelevant material from that testimony. At the conclusion of counsel's work, a redacted transcript was produced which contained over 100 pages of Detective Serrano's direct and cross-examination. When the trial court gave that redacted transcript to the jury, in open court, and in the presence of defendant and counsel, it told them, that, in pertinent part: "You can pass it [the redacted transcript] around. Take a look at it. And find what you are looking for, in the hopes *[sic]* that it will expedite your deliberations".

Our examination of the trial transcript indicates that defendant's counsel did not object, and in fact, specifically agreed to have the redacted transcript submitted to the jury.

Although a "defendant has a fundamental right to be present at all material stages of a trial" *(People v Mehmedi,*

*supra,* at 760), a trial court, when answering a jury's request for information during deliberations, "is vested with some measure of discretion in framing its response and is in the best position to evaluate the jury's request in the first instance" *(People v Malloy,* 55 NY2d 296, 302 [1982], *cert denied* 459 US 847 [1982]).

An example of a valid exercise of the trial court's discretion is found in *People v Carrero* (140 AD2d 533 [1988]) which was a case that involved a conviction for the criminal possession of a controlled substance. In that case, the jury, during deliberation, requested a read back of the testimony of a detective and the defendant. The trial court responded by having the stenographer read back the detective's testimony, and then the trial court "recessed for approximately 20 minutes to conduct court business and to allow the stenographer a rest. As the jury retired to the jury room, the court told the jury to let it know if it wanted to hear the other testimony. During the recess, the jury sent a note indicating they had reached a verdict. The court thereafter polled each juror to ascertain if he or she wished to hear the defendant's testimony and each juror declined" *(People v Carrero, supra,* at 534).

Applying our analysis of the legal authority, *supra,* to the facts of the instant case, where defendant's counsel participated in the preparation of the redacted transcript, and did not object to its submission to the jury, we find that there was no violation of defendant's "right to be present at all material stages of [the] trial" *(People v Mehmedi, supra,* at 760).

Nevertheless, even though we hold in this case, where there was overwhelming evidence of the defendant's guilt, that the trial court gave a meaningful response, which did not prejudice defendant, to the jury's request for the entire testimony of Detective Serrano, and since counsel actually participated in redacting irrelevant parts of said transcript and did not object to its submission to the jury, we express our disapproval of the practice of submitting a transcript of testimony for review in the jury room. Although in complying with a jury's request for a readback of testimony, a trial court "is vested with some measure of discretion in framing its response" *(People v Malloy, supra,* at 302), nevertheless, in our opinion, the best practice is for trial courts to direct a readback in the courtroom, in the presence of defendant and counsel.

We further hold that, when a defendant objects to any technique that a trial court proposes to use to provide testi-

mony to a jury, which constitutes anything other than a readback, the trial court must direct a readback in the courtroom with defendant and counsel present.

Further, the defendant contends that the trial court committed reversible error in permitting the prosecutor to elicit testimony about Detective Serrano's negotiation, on May 25, 1983, with defendant's wife for the purchase of a quantity of heroin, since that testimony was allegedly prejudicial, in view of the fact that this crime had not been charged in the indictment.

The May 25th negotiation, as described *supra,* took place on Detective Serrano's first visit to defendant's Brook Avenue apartment, when the undercover officer was unable to see defendant, since his wife asserted he was asleep.

When defendant's counsel objected to that testimony and moved for a mistrial, the trial court gave a limiting instruction to the jury, in which it stated, in pertinent part: "Counsel have asked, and I have agreed, for a cautionary instruction here that the testimony that you're hearing now in no way relates to the specific charges that are pending in the indictment against [the defendant and Mr. DeJesus]. It is background information, you may weigh it and evaluate it from the standpoint of everything that's transpired, but you have to keep your eye on the ball. The defendants are charged with selling drugs on two specific dates in those amounts that we've already heard. That's the only charge against them".

It is well established that, even though evidence of uncharged crimes is not admissible, when it is offered for the purpose of establishing a defendant's criminal propensity, such evidence may be admissible, when it is inextricably interwoven with the charged crime, and its probative value outweighs any possible prejudice *(People v Vails,* 43 NY2d 364, 368-369 [1977]).

After our review of the evidence, we find that the trial court gave adequate limiting instructions with reference to such evidence. Although the Court of Appeals has held "[s]uch testimony [is] admissible to complete the narrative of the episode" *(People v Gines,* 36 NY2d 932-933 [1975]), we feel that same is not the most desirable practice. However, in this case, where the evidence of guilt was overwhelming, we would hold that, if there was error, same would be harmless *(People v Crimmins,* 36 NY2d 230 [1975]).

In addition, the defendant contends that the trial court

committed reversible error in denying defendant's request that the jury be instructed on the defense of agency.

■ The defense of agency is available to " 'one who acts solely as the agent of the buyer [of narcotics]' " *(People v Lam Lek Chong,* 45 NY2d 64, 73 [1978], *cert denied* 439 US 935 [1978]).* The record clearly indicates that the defendant had an independent desire or inclination to promote the transactions *(People v Argibay,* 45 NY2d 45, 53-54 [1978], *cert denied sub nom. Hahn-DiGuiseppe v New York,* 439 US 930 [1978]).* Clearly, if defendant was acting as an agent, the overwhelming evidence would indicate he was his cousin's agent. In fact, the defendant was clearly acting in concert with his cousin.

The law is clear that where there is no reasonable view of the evidence that supports the inference that the defendant was acting merely as the agent of the buyer, a trial court may decline to instruct the jury on that defense *(see, People v Roche,* 45 NY2d 78, 82-87 [1978], *cert denied* 439 US 958 [1978]).*

Based upon our examination of the evidence, we find that the trial court did not err in denying an agency charge, "since no reasonable view of the evidence suggests that the defendant was acting as a mere instrumentality of the [undercover officer]" *(People v Carter,* 151 AD2d 688, 689 [1989]).*

Another contention of the defendant is that the trial court committed reversible error, in that its allegedly inconsistent and improper rulings prevented the defendant from asserting an entrapment defense.

In his opening statement, defense counsel stated that he would raise the entrapment defense. Prior to the redirect examination of Detective Serrano, the prosecutor asked the trial court whether the undercover officer could be questioned about defendant's uncharged crimes.

■ Under this State's law, when a defendant interposes an entrapment defense, evidence of uncharged crimes may be admissible to rebut the claim that defendant did not possess a criminal predisposition *(People v Crandall,* 67 NY2d 111, 118 [1986]).*

At the point that the prosecutor requested a ruling from the trial court concerning uncharged crimes, the trial court noted that the defense had not yet established the entrapment defense, since the defendant had not conceded "an illegal transaction [had] occurred but [denied] * * * criminal intent" *(People v Crandall, supra,* at 118). Therefore, the trial court,

in substance, advised defense counsel that if he continued to assert the entrapment defense, it would permit the prosecutor to present evidence of uncharged crimes. In response, the defense counsel, after consultation with the defendant, made the tactical decision to abandon the entrapment defense. We find, upon review of the record, that the trial court correctly expounded the law in its ruling on entrapment.

We have considered the other arguments of defendant and find them to be without merit.

Accordingly, judgment, Supreme Court, Bronx County (Lawrence J. Tonetti, J.), entered December 14, 1984, which, after a jury trial, convicted defendant of the crimes of criminal sale of a controlled substance in the first degree (Penal Law § 220.43), and criminal sale of a controlled substance in the second degree (Penal Law § 220.41), and sentenced him to concurrent indeterminate prison terms of 15 years to life and 6 years to life, respectively, should be affirmed.

MURPHY, P. J., SULLIVAN, MILONAS and RUBIN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on December 14, 1984, unanimously affirmed.