■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWIN GODFREY, Appellant.—Judgment reversed on the law and new trial granted. Memorandum: The court was required to instruct the jury on the defense of justification for the use of deadly physical force to prevent or terminate the commission of a burglary if there was any reasonable view of the evidence by which the jury could find that defendant reasonably believed that the victim was committing or attempting to commit a burglary and that defendant reasonably believed that the use of deadly physical force was necessary to terminate the commission or attempted commission of the burglary (see, *People v Argibay,* 45 NY2d 45, 53, *rearg denied* 45 NY2d 839; *People v Roche,* 45 NY2d 78, 86, *cert denied* 439 US 958; *People v Behlin,* 150 AD2d 591, *lv denied* 74 NY2d 805; *People v Williams,* 121 AD2d 145, 148-149; Penal Law § 35.20 [3]).

Here, there was such a reasonable view of the evidence. Defendant testified that the victim and defendant went to defendant's house where the victim threatened to "kick his ass". Twice defendant told the victim to leave his house and the victim refused, telling defendant to get his gun and "use it. If you don't, I will." When the victim came at defendant, defendant discharged his gun, killing the victim. Viewing the evidence in the light most favorable to defendant, the jury could conclude that, once the victim was ordered to leave the premises, his license to be on the premises was revoked and, thereafter, he remained unlawfully. The jury could also conclude that the victim remained in the building unlawfully with the intent to commit the crime of assault therein and, thus, was in the process of committing a burglary (Penal Law § 140.20), or that defendant so reasonably believed. Further,

the jury could conclude that defendant reasonably believed that the use of deadly physical force was necessary to terminate the burglary.

The District Attorney argues that other sections of Penal Law article 35, governing the defense of justification, should be read into Penal Law § 35.20 (3) so that the use of physical force to prevent or terminate a burglary should be limited to instances where the defendant reasonably believes that his life is in danger. The legislative history of section 35.20 (3) indicates otherwise. When the new Penal Law was enacted in 1965 (L 1965, ch 1030), it did not contain a provision authorizing the use of deadly physical force to prevent or terminate a burglary. The present section 35.20 (3) was added by chapter 73 of the Laws of 1968. The legislative memorandum in support of the legislation explains one "significant change" proposed by the legislature. "[T]he scope of the authorization to use deadly force is expanded by according such right to the burglary victim when he reasonably believes such to be necessary in order to prevent or terminate the burglary or attempted burglary. This meets the fear espoused by persons across the State that they had been placed in the dangerous posture of responding to force during home burglaries" (1968 McKinney's Session Laws of NY, at 2246; *see also,* Leibovitz, *Justifiable Use of Force Under Article 35 of the Penal Law of New York,* 18 Buffalo L Rev 285, 294 [1968-1969]). The legislative intent not to qualify the authorization of Penal Law § 35.20 (3) is expressed by Penal Law § 35.10 (6), which provides that whenever a person is authorized by any of the ensuing provisions of article 35 "to use deadly physical force in any given circumstance, nothing contained in any other such provision may be deemed to negate or qualify such authorization."

Because the court denied defendant's request to charge the defense of justification under Penal Law § 35.20 (3), the judgment must be reversed.

We have reviewed defendant's remaining contentions and find them to be without merit.

All concur, except Dillon, P. J., and Davis, J., who dissent and vote to affirm, in the following Memorandum.

Dillon, P. J., and Davis, J. (dissenting). We respectfully dissent. On this record, and more particularly, on the testimony of defendant, it must be said as a matter of law that the victim was not committing or attempting to commit a burglary when he was killed by defendant. Thus the court prop-

erly denied defendant's request that the jury be instructed on the defense of justification set forth in Penal Law § 35.20 (3).

It is undisputed that at about 12:30 A.M. on October 12, 1982 defendant killed the victim, Rodney Marsh, by shooting him four times in the neck and chest. Although the People offered substantial evidence that defendant invited the victim to defendant's home and forewarned the victim that he would shoot and kill him, analysis of the issue presented requires that only defendant's testimony be reviewed, albeit more expansively than is done by the majority.

Defendant testified that three weeks prior to the homicide he and the victim were "playing with each other" while at a motorcycle club. The victim said that he would shoot defendant, and defendant responded that he would shoot the victim. Defendant left the motorcycle club and went to his mother's car to get a gun. He loaded the gun, "jammed it" so that it wouldn't fire, gave it to the victim and said, "Shoot, I bet you wouldn't shoot nobody." The victim aimed the gun at defendant and pulled the trigger but the gun "wouldn't shoot".

Defendant acknowledged that the victim was "not really a close friend", that the victim had previously accused defendant of "using" the victim's brother, Willie Marsh, who was defendant's close friend, and that when the victim drank and smoked marihuana, "he didn't make much sense" and he "thought he was a tough guy".

Defendant recounted the events of the evening preceding the early morning shooting. At about 9:00 P.M. on October 11, 1982 Willie Marsh and the victim went to defendant's home and had two quarts of beer with them. The three left defendant's home and went to a Wilson Farms store where defendant bought a third quart of beer. After drinking the beer, the three men went to a liquor store where defendant and the victim bought a quart of cheap wine and a bottle of cheap brandy. They mixed the wine and brandy and drank the mixture. They were joined by a fourth man, Terry Crittenden, who bought more beer. All of the men were drinking and all, except defendant, were smoking marihuana. The victim and Crittenden began shadow boxing and the victim said that he was going to "punch out" Crittenden. Defendant told him not to do it. Defendant and the victim began to argue. Defendant testified that the victim "was saying what he could have done to me, such as punch me out. I was saying he was crazy, he couldn't touch me, because I was faster than him, things like that you know, and he said, he obviously got upset, he said something about he will or could kill me, and then I also told

him, he must be mad you know, and then he made a statement saying about he will blow my brains out, and that is when I said you're crazy, I said because, if you ever came at me with a gun, I would have no other choice but to shoot you, because when we was playing around, you tried to shoot me [referring to the confrontation three weeks earlier at the motorcycle club] * * * [he] stated I wouldn't do anything to him and that he would be the one kicking my ass. He said I prove it to you, I take you to your house and kick your ass you know."

Defendant waited while the victim called a cab. Both men entered the cab and rode to defendant's residence. Defendant waited for the victim on the front porch while the victim paid the cab fare. As the two men entered the house, the victim immediately told defendant to get his gun. Defendant went to his bedroom and took his gun from the closet. The victim entered the bedroom and defendant pointed the gun at the victim. The victim attacked defendant, and defendant threw the gun to the floor. They struggled and defendant retrieved the gun. The victim grabbed defendant from behind and they wrestled from the bedroom into the dining room. Defendant again threw the gun to the floor and the two wrestled from the dining room into the living room. When the two were "through wrestling" they were "huffing and puffing from the exhaustion". Each one asserted that he had not been beaten in the fight and the victim said to defendant "I told you that you can't beat me." After sitting for a minute, defendant retrieved the gun from the floor and "started unloading it". Defendant told the victim to get out of the house and when the victim didn't respond, defendant told him again to get out of the house. The victim said "he wasn't going no where" and walked toward defendant. As he did, he said "you got your gun, use it, if you don't, I will". The victim tried to take the gun from defendant and defendant "shoved him off". The victim again came toward him and defendant "started shooting". Four bullets entered the body of the victim.

The court viewed defendant's testimony in the light most favorable to defendant and correctly charged the jury on the justifiable use of deadly physical force by a person in his dwelling (see, Penal Law § 35.15 [2] [a] [i]). The evidence was insufficient as a matter of law, however, to support a charge on the justifiable use of deadly physical force to prevent or terminate the commission or attempted commission of a burglary and thus defendant's request to so charge was properly denied.

A burglary is committed when one "knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein" (Penal Law § 140.30). Trespass is an essential element of the crime of burglary *(see, People v Graves,* 76 NY2d 16). Here, the victim entered defendant's premises not only with defendant's consent, but with defendant's knowledge of the victim's expressed intent to commit a crime upon the person of defendant. From the moment of entry, defendant was a knowing and willing participant in the victim's criminal conduct. Nevertheless, defendant, relying on his testimony that he twice ordered the victim to leave the house, seeks to convert the victim's status from that of a licensee to that of a trespasser who remained unlawfully on the premises for the purpose of assaulting defendant. That conversion may not so casually be made.

The "remains unlawfully" prong of the burglary statute was enacted in 1965 to address cases involving "unauthorized remaining in a building after lawful entry (as a shoplifter who remains on store premises after closing)" *(People v Gaines,* 74 NY2d 358, 362). The parenthetical example cited in *Gaines* is markedly different from the fact pattern we see here. The facts at bar are more closely akin to those found in *People v Konikov* (160 AD2d 146, *lv denied* 76 NY2d 941) and *People v Hutchinson* (124 Misc 2d 487, *affd* 121 AD2d 849, *lv denied* 68 NY2d 770).

In *Konikov,* the defendant arrived at the home of his estranged stepmother, refused to leave when told by her to do so, became involved in an argument with her and then assaulted her. In addressing whether the People established the defendant's guilt of burglary under the "remains unlawfully" prong of the burglary statute, the Second Department wrote: "More fundamentally, we question whether the framers of the 'remains unlawfully' language intended to transform a misdemeanor assault into the more serious felony of burglary in the second degree, merely upon a showing that the complainant, during a rapidly escalating verbal dispute, ordered the defendant to leave an apartment vestibule immediately prior to the assault. Such an expansive construction of the statutory term appears to be inconsistent with the purpose originally underlying its enactment" *(People v Konikov, supra,* at 152). The Court concluded that, in the circumstances: "[N]either the defendant's assaultive conduct nor the events which preceded it, constituted evidence sufficient to support an inference that the defendant * * * contemporaneously harbored such an intent [to assault his stepmother] while 'remaining unlawfully'

in the apartment vestibule. To sustain the defendant's conviction under the circumstances presented, would be to impose liability for the crime of burglary merely because the assault was preceded by the victim's demand that the defendant exit the premises. Under the circumstances presented, we decline to extend the reach of the burglary statute in such a fashion *(cf., People v Graves,* 76 NY2d 16, *supra; People v Gaines,* 74 NY2d 358, *supra)" (People v Konikov, supra,* at 154).

In *People v Hutchinson (supra)* the defendant entered complainant's apartment as an invited guest but thereafter threatened complainant with a knife. Complainant ordered defendant to leave the apartment, a struggle ensued, and defendant stabbed complainant and fled. The People contended that defendant's license to be on the premises was revoked when he pulled a knife on the complainant *(People v Hutchinson, supra,* at 490). The Court rejected that argument and also concluded that the order to leave the apartment did not transform defendant's status from that of a guest to that of a trespasser. The Court wrote: "This is not to say that one who initially enters private premises with consent never remains unlawfully so as to incur liability for burglary. But there must be something more to establish termination of license than the commission of a criminal act or an order to leave after a criminal intention is manifested" *(People v Hutchinson, supra,* at 492).

We share the views expressed in *Konikov (supra)* and *Hutchinson (supra)* and we find them to be particularly applicable here. By no stretch of defendant's testimony can the victim's conduct be equated with that of a burglar. There was no reasonable view of the evidence which required the Court to grant defendant's request to charge. In the circumstances presented, the Court fully protected defendant's rights by the charge it gave on self-defense as justification for defendant's use of deadly physical force. We would affirm the judgment of conviction. (Appeal from Judgment of Niagara County Court, Hannigan, J.—Murder, 2nd Degree.) Present—Dillon, P. J., Boomer, Green, Lowery and Davis, JJ.