OPINION OF THE COURT
Wachtler, J.
The defendant has been convicted of criminal sale of a controlled substance in the first degree (Penal Law, § 220.43) for allegedly selling a pound and a half of heroin to two undercover police officers in Manhattan. At the trial the defendant denied selling the drugs and testified instead that he had simply acted as the agent of the buyers, by locating a seller and helping the officers complete the purchase. On this appeal the defendant claims that the trial court erred in charging the jury that he could only be considered an agent of the buyers if he acted "purely gratuitously” and that if he received "any benefit, however slight, from having participated in the transaction, he would not be an agent [of the buyers], but a seller.” The prosecutor takes the position that the defendant was not prejudiced by the charge because the evidence, particularly the defendant’s own admissions at the trial, conclusively shows that he was not acting solely as an agent of the buyers. The People also urge that the so-called "agency defense” has been interpreted too broadly by the Appellate Divisions and should either be abandoned or applied only to a narrow class of cases.
The indictment charging the defendant with selling heroin to two undercover police officers on May 30, 1974 was the result of a joint State and Federal narcotics investigation which had begun in January of that year.[1]
*69 At the trial the undercover officers, Wright and Mingo, testified that they first met the defendant on January 24, 1974 at a travel agency, located on Park Row in Manhattan, which was owned and operated by the defendant. They introduced themselves by mentioning a mutual acquaintance, apparently involved in drug traffic, and during a half hour conversation indicated to the defendant that they were pimps and narcotics dealers who had a considerable amount of money available which they wished to invest in heroin. The defendant suggested that they purchase the drug in Hong Kong and smuggle it into the country by, for instance, using women couriers. When the officers asked the defendant if he could sell them some heroin he introduced them to Shark Fish, also known as Robert, who he said "can help you out.”
Several days later Robert and an individual named Sonny sold the officers a pound and a half of heroin at $28,000 a pound. The officers apparently were only prepared to purchase a pound but the dealers insisted that they take the full amount, and the officers left owing $14,000. On January 30 Officer Mingo called the defendant to tell him the heroin was good. In this and later conversations the defendant reminded them of the balance due and told them that the sellers threatened to hold him responsible if the officers failed to pay. Eventually the officers paid the balance; part of it directly to the sellers and the remainder to the defendant. The defendant kept the initial payment of $1,000 but transmitted a later $4,000 payment to Sonny and Robert.
During these meetings the defendant told the officers that he had connections in Hong Kong and cited instances where heroin purchased in the Far East had been smuggled into the United States by ordinary mail, women couriers and merchant seamen. He told them that he had sent a man to Hong Kong to investigate.
Throughout March and April the defendant had several meetings with the officers in various Manhattan hotel rooms. At the first meeting, on March 5, he told them that in the past he had been involved with heroin on a part-time basis but having met them was prepared to arrange a big sale, as much as 50 or 100 pounds. He said that his man in Hong Kong had reported that he could arrange for them to purchase as much heroin as they wanted. He later introduced them to David Chan, the owner of an import-export business *70 who agreed, to smuggle 50 to 100 pounds of heroin into the country for them.
It was finally arranged that the officers would fly to Hong Kong where they would meet an individual named Francisco. The defendant would accompany them provided they paid the expenses of his trip. Mingo and the defendant would remain in the hotel room while Wright went to inspect the heroin. If he found it acceptable Wright would call Mingo who would then transfer the money to the defendant who, in turn, would deliver it to an individual in another room. The heroin would then be delivered to Chan who would seal it in soy bean cans and ship it to the United States. Prior to leaving the officers gave the defendant $1,000 toward his expenses.
On April 17 the officers arrived in Hong Kong where they met the defendant and Chan and were later introduced to Francisco. The defendant told them that they could purchase 100 pounds and showed them a sample of brown rock heroin. After several days of negotiations the deal fell through when the officers refused to put up several thousand dollars as "front money” before being permitted to inspect the full amount offered for sale.
On May 5, having returned to New York, the officers called the defendant at his travel agency and told him they were still interested in buying heroin in smaller quantities. The defendant agreed to contact Robert or Sonny. In numerous telephone conversations between the defendant and the officers negotiations continued throughout the month of May. At one point, May 28, the defendant told the officers that Francisco had agreed to sell them heroin. The next day the defendant told them the sale would take place that night. When Mingo told him that they did not have the money on hand and that it was too late to go to the bank, the defendant complained that something was always going wrong either on "your side” or "this side.”
On May 30 the defendant told the officers that he had a pound and a half of heroin and later arranged to meet them at First Avenue and 6th Street at 11 o’clock that evening. He said they should bring the money and also wanted to be reimbursed for his Hong Kong expenses.
When the officers drove to the scene they saw Robert sitting in a car nearby. They were talking to Robert when the defendant arrived and entered their car. He asked them "Why you play with Robert” and then said "It’s not Robert doing, *71 it’s me doing * * * I give you the stuff, you give me the money, everybody gives, you go and I go OK.” The defendant asked them if they had the money including "my piece”. They said they had $45,000 and "you get your piece out of that.” After the officers showed him an attaché case full of money the defendant told them to drive to another location where he got out of the car and asked Mingo to come with him.
The defendant and Mingo entered a nearby building and went to Francisco’s apartment, which the defendant opened with a key. Inside the apartment the defendant led the officer to a garbage can, removed a package and gave it to the officer stating that it contained one and one-half pounds of brown rock heroin. As they left the building the defendant was arrested.
Most of the conversations with the defendant — on the telephone, in the Manhattan hotels and in the car prior to the sale on May 30 — had been recorded by the police and were played for the jury at the trial. Analysis of the package given to Officer Mingo confirmed the defendant’s statement that it contained one and one-half pounds of heroin.
As noted the defendant testified that he had never sold heroin to the officers but had simply assisted them in their efforts to purchase the drug. He stated that when he first met them he suggested that they invest their money in certain legitimate businesses he planned, specifically a Harlem travel agency and a downtown nightclub. When they insisted on buying heroin he introduced them to a seller in order to cultivate their friendship. He did not participate in the January sale and he received no compensation for bringing buyer and seller together. He admitted that following that sale the officers gave him several thousand dollars and that he kept $1,000. However he claimed that this was a loan to cover his expenses for an upcoming business trip to London.
He also testified that his references to connections in Hong Kong and knowledge of heroin traffic and smuggling routes was part of a story he made up and told the officers to maintain their interest in him. When he was pressured to deliver, he led them on a wild-goose chase to Hong Kong. Upon their return, in order to redeem himself, he once again agreed to help them purchase heroin. Thus he negotiated with Francisco on their behalf and later brought them to the seller’s apartment. However he denied handing Mingo the package of heroin and claimed that they left the apartment *72 when they found the door open and the apartment empty. It was not until they reached the street that the defendant realized that Mingo was carrying a package.
The defendant testified that he did not receive, and was not to receive any profit from this transaction. He was not working for Francisco and expected no compensation from him. He did expect the officers to reimburse him for his Hong Kong expenses, but he did not expect to share in the profits when they resold the heroin. In short, he claimed that he had simply acted out of friendship and with the hope that if he helped them purchase heroin they might later help him by investing in certain legitimate business ventures.
Under New York law a person may be found guilty of selling drugs when he gives them to another even though he has received nothing in return. Subdivision 1 of section 220.00 of the Penal Law states: " 'Sell’ means to sell, exchange, give or dispose of to another, or to offer or agree to do the same.” Reading the statute literally, any passing of drugs from one person to another would constitute a sale. There are cases where it can be seen that this is what the Legislature intended. For instance, the pusher who introduces a potential addict to heroin, free of charge, is at least as culpable as the pusher who sells to one who is already addicted, and there is no reason why they should be treated differently under the law (cf. People v Broadie, 37 NY2d 100, 113). There are also sophisticated drug transactions, particularly larger sales, where it may be difficult or impossible to prove there has been a sale or exchange in the ordinary sense because the transfer of the drugs and the money may occur at different times and places. In those cases too proof of the transfer of the drugs alone may suffice to prove the sale.
However there are certain cases where the defendant’s mere delivery of the drugs does not appear to involve the same degree of culpability, or warrant the extreme penalties, associated with pushing drugs. For instance, when a friend of the defendant gives him money and asks him to purchase a small quantity of drugs the defendant’s delivery of the drugs to the buyer could be considered a sale under a literal interpretation of the statute although, as a practical matter, he was simply a buyer who purchased the drugs on behalf of another.
, The People urge that in such a case the Legislature intended the defendant to be considered a seller because intermediaries, like sellers, are an essential link in the illicit *73 drug traffic the statute was designed to eliminate. This, of course, could also be said of buyers, since without buyers there would be no sales. Nevertheless the buyer is not considered an accomplice of the seller (People v Pasquarello, 306 NY 759), and in fact the buyer, despite his key position in the drug cycle, is generally treated more leniently than the seller. Buying drugs is not a crime in itself, although the buyer may be convicted of illegal possession (Penal Law, §§ 220.03, 220.06, 220.09, 220.16, 220.21). But the buyer’s liability for possession of a narcotic drug is not as great as the seller’s liability for making the sale (compare Penal Law, § 220.43, subd 1, and § 220.18, subd 1; § 220.41, subd 1, and § 220.09, subd 1; § 220.39, subd 1, and § 220.03) unless a large sale is involved (see Penal Law, § 220.43, subd 1; and § 220.21, subd 1).
Under similar statutory schemes, where the buyer’s criminal liability differs from the seller’s, it has been held that the intermediary who merely purchased the item for the buyer cannot be convicted of selling. The rule was first recognized at the turn of the century in cases involving the sale of alcohol where the statutory scheme prohibited the sale or furnishing of liquor but did not prohibit the purchase. Despite the broad wording of the statute it was held that the Legislature did not intend to punish, as a seller, one who had simply purchased a bottle at the buyer’s request to accommodate him (see, e.g., State v Lynch, 81 Ohio St 336; Ann., 28 LRA [NS] 334; see, also, Ann., 24 LRA [NS] 268; People v McCrory, 222 NYS2d 112). The rule was later adopted by the Federal courts as applicable to illegal alcohol and drug transactions (United States v Sawyer, 210 F2d 169; United States v Moses, 220 F2d 166; but see United States v Pruitt, 487 F2d 1241).
In this State it has long been held that "[o]ne who acts solely as the agent of the buyer cannot be convicted of the crime of selling narcotics” (People v Branch, 13 AD2d 714; see, also, People v Buster, 286 App Div 1141; People v Lindsey, 12 NY2d 958, People v Wright, 15 NY2d 555; People v Bray, 15 NY2d 637; People v Hollins, 19 NY2d 864; People v Harris, 24 NY2d 810; People v Hingerton, 26 NY2d 790; People v Jenkins, 41 NY2d 307; People v Carr, 41 NY2d 847; People v Silverman, 23 AD2d 947; People v Fortes, 24 AD2d 428, app dsmd 17 NY2d 583). The rule is essentially an interpretation of the statute defining the term "sell” (Penal Law, § 220.00, subd 1, formerly Penal Law, § 220.00, subd 5) and is designed to carry out the legislative intent under an elaborate and *74 carefully drawn statutory scheme which, although broadly aimed at destroying traffic in drugs (see People v Broadie, 37 NY2d 100, supra), imposes different liability on buyer and seller in all but the largest sales.
Since the State-wide acceptance of the agency principle, the statutory definition of "sell” has been revised as part of the over-all revision of the Penal Law effective in 1967 (L 1965, ch 1030). The wording however is essentially the same — the Legislature added "dispose of’ to "sell, exchange or give” (compare former Penal Law, § 1751, subd 1) — and there is no indication that the Legislature intended to abandon the judicial construction which had been previously accepted throughout the State. Indeed following the revision of the Penal Law, and the later extensive amendments to the drug article (Penal Law, art 220, L 1973, ch 276; see People v Broadie, 37 NY2d 100, supra) the courts have continued to apply and refine the agency concept in cases where the defendant acted as an intermediary between buyer and seller (see, e.g., People v Jenkins, 41 NY2d 307, supra; People v Carr, 41 NY2d 847, supra; People v Fuller, 34 AD2d 852; People v Pierce, 40 AD2d 581; People v Flanagan, 47 AD2d 959; People v Bostick, 51 AD2d 749; People v Munoz, 54 AD2d 844).
The so-called agency defense is not a complete defense. The defendant who has been a party to a drug sale is not relieved of all criminal responsibility simply because he was acting for the buyer. The agency concept is essentially a means of determining the extent of the intermediary’s culpability, and thus the nature of his crime, under a statutory scheme which reserves the most severe penalties for the "tycoons of the trade” (see 1964 Commission Staff Notes, to the Revised Penal Law, art 225, now art 220). Evidence that the defendant was acting solely as an agent of the buyer is properly employed to determine whether he is guilty of possession, instead of sale (cf. People v Carr, 41 NY2d 847, supra). The fact that the defendant was acting as a buyer is no defense to a possession charge when the Legislature has made buyers liable for the offense (People v Sierra, 45 NY2d 56, decided herewith; People v Argibay, 45 NY2d 45, decided herewith; People v Sheldon K., 26 NY2d 949).
The determination as to whether the defendant was a seller, or merely a purchaser doing a favor for a friend, is generally a factual question for the jury to resolve on the circumstances of the particular case (see, e.g., People v Bray, *75 15 NY2d 637, supra; People v Hingerton, 26 NY2d 790, supra; People v Harris, 24 NY2d 810, supra; People v Carr, 41 NY2d 847, supra). Among other things the jury may consider the nature and extent of the relationship between the defendant and the buyer, whether it was the buyer or the defendant who suggested the purchase, whether the defendant has had other drug dealings with this or other buyers or sellers and, of course, whether the defendant profited, or stood to profit, from the transaction. But basically the jury must rely on its own common sense and experience to determine whether, under the circumstances, the defendant was in fact accommodating a friend or was simply a streetwise peddler attempting to avoid the penalties for sale. Of course the accommodation buyer is not uncommon and the average person, including the juror, should be able to perceive "the reality of the situation * * * without minutely detailed analysis” or instruction from the court (People v Yanik, 43 NY2d 97, 100-101). There is no legal formula for determining the defendant’s intent at the time of the drug transfer.
Thus the jury may find that the defendant who frequently or regularly purchased durgs for other persons from the same seller was allied with the seller. But even though the defendant may admit the other purchases the jury should not be precluded from finding, as a matter of fact, that he was in the habit of doing favors and acted solely on the buyer’s behalf at the time of the sale (People v Carr, 41 NY2d 847, supra; cf People v O’Keefe, 87 Misc 2d 739).
Similarly the fact that the defendant anticipated or received a profit from the sale may be sufficient to establish his intent to sell at the time of the transfer. But it is not unlikely that the buyer, who has obtained drugs with the aid of the defendant, will offer the defendant a share, a tip or reimbursement for expenses as a token of friendship or appreciation for the favor. This frequently happens when the buyer has purchased the drugs or marihuana for consumption and the defendant shares his tastes or is himself an addict. Of course receipt of any benefit, particularly a substantial reward promised in advance may be sufficient, as a matter of fact, to show that the defendant did not act solely to accommodate the buyer. But receipt of some incidental benefit, does not necessarily or even ordinarily alter the relationship between the parties, the nature of the transaction or the defendant’s culpability.
 Thus the court erred in charging the jury that they *76 could not find that the defendant acted as an agent of the buyer if he received any benefit however slight (People v Bostick, 51 AD2d 749, supra; People v Valentine, 55 AD2d 585; People v Rodriguez, 56 AD2d 545; People v Wright, 15 NY2d 555; People v Fortes, 24 AD2d 428; cf. People v Bray, 15 NY2d 637, supra; People v Robert W., 47 AD2d 793). The error however does not call for reversal because on this record the defendant was not entitled to an agency charge.
This is not a case where the defendant simply purchased and delivered a small quantity of drugs solely to accommodate a friend, without any commercial interest in promoting a sale (see, e.g., People v Argibay, 45 NY2d 45, supra). Here the defendant admitted at trial that he had arranged a large drug sale and hoped to receive a substantial benefit in the form of business loans from the grateful buyers. The transaction in fact was completely commercial since the buyers themselves obviously did not intend to consume one and a half pounds of heroin, and indeed, the defendant admitted that they had informed him that they were drug dealers who intended to obtain the drugs for resale. Thus the defendant admitted that he was an intermediary between drug merchants and intended to profit, at least collaterally, from the delivery of the drugs and therefore from the commercial traffic in drugs generally. Realistically, by his own admissions, the defendant could only be considered one of the drug merchants or sellers for whom the Legislature has reserved the most severe penalties. On his own testimony, despite his protestations, it is concluded, as a matter of law, that on no reasonable view could a jury have found defendant to be merely an agent.[2]
This then is one of those cases where it is clear that the Legislature intended the statute to apply literally. In view of the commercial quantity of the drugs involved and the defendant’s clear intent to exploit the sale, the jury could only find that *77 the defendant was a seller once they found, as they did, that he gave the drugs to the officers (Penal Law, § 220.00, subd 1).
Accordingly, the order of the Appellate Division should be affirmed.

.The defendant was also indicted by a Federal Grand Jury. Following the trial on the State indictment the defendant was tried in Federal court and was convicted of conspiring to import and distribute heroin in violation of section 846 of title 21 of the US Code. That conviction has been affirmed (United States v Lam Lek Chong, 544 F2d 58).

.We also note that in cases like this, involving large drug sales, the Legislature has not followed the general statutory scheme of imposing different criminal liabilities on buyer and seller. Under the new drug law (L 1973, ch 276) anyone who sells one or more ounces of a narcotic drug is guilty of an A-I felony (Penal Law, § 220.43, subd 1) and anyone who possesses two or more ounces of a narcotic drug is also guilty of an A-I felony (Penal Law, § 220.21, subd 1). Thus in the large drug sales — that is, any sale involving two or more ounces of narcotic drugs — the Legislature has imposed the same penalty on buyer and seller. The theory is that anyone possessing a large quantity of drugs intends to resell them and is a drug merchant who is just as culpable as the seller from jvhom he has purchased them (People v Broadle, 37 NY2d 100, 113, supra).