Will WASHINGTON, Petitioner–
Appellant,

v.

Charles JAMES, Respondent–Appellee.

No. 525, Docket 91–2534.

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1992.

Decided June 29, 1993.

Karen G. Leslie, New York City, for appellant.

Martin A. Hotvet, Asst. Atty. Gen., State of NY, New York City (Robert Abrams, Atty. Gen., Nancy A. Spiegel, Asst. Atty. Gen., of counsel), for appellee.

Before: MESKILL, Chief Judge, OAKES and KEARSE, Circuit Judges.

MESKILL, Chief Judge:

Appellant Will Washington appeals from a judgment entered in the United States District Court for the Western District of New York, Curtin, *J.*, denying his petition for a writ of habeas corpus. Washington argues that the district judge erred on the merits. We do not reach the merits, however, because we believe that Washington procedurally defaulted his federal claim by failing to raise it adequately before the state courts. Because neither party briefed this issue, we requested supplemental briefs from both parties addressing the following question:

> Whether, and to what extent, the analysis in *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), should be applied by a federal appellate court reviewing the denial of a habeas petition in determining whether to reach the merits of a constitutional argument, where the state prosecutor has incorrectly conceded that the argument was properly raised to the state courts and therefore failed to object in the district court that the argument

could not be raised because of procedural default.

We hold that Washington's procedural default may not be excused either under *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), or under *Granberry*, and accordingly we affirm the judgment of the district court.

## BACKGROUND

On May 27, 1986 Undercover Officer Joe Petronella picked up Ms. Verenda Starks in his car and they set off to buy drugs, as arranged. Petronella had purchased drugs from Starks before. The two were accompanied by a confidential informant who was unavailable for the trial. Petronella was wired and his conversations were recorded by a surveillance team.

Starks did not know exactly where to find drugs because it seems she had not used them in some time. Nevertheless, she finally led Petronella to a street in Buffalo where Washington was standing. Petronella parked the car a half block beyond the spot where appellant was standing, and Starks got out and walked back to him. After talking with him for a few moments (he was a friend), she returned to the car and told Petronella that heroin cost $15 per bag. Starks testified that Petronella had already given her $50 to buy five bags on her original belief that each bag cost $10. Ultimately he gave her a total of $60 to buy four bags. She then asked Washington to enter a nearby dope house and purchase the heroin for her. Washington was in and out in under five minutes. After giving the drugs to Starks, he walked back to where he had been and Starks got back into the car. Petronella gave Starks $10 for her efforts. Although the prosecution speculated that Washington kept the extra $5 per bag, there is no evidence that he received any benefit for buying the drugs.

Both Washington and Starks were indicted in Erie County as accomplices in the Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39 (McKinney 1992), and the Criminal Possession of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.16 (McKinney

1992). Criminal sale requires that the defendant knowingly and unlawfully sell a narcotic drug. Criminal possession requires. that the defendant knowingly and unlawfully possess a narcotic drug with the intent to sell. Although the jury found Washington guilty of criminal sale, it deadlocked on the criminal possession charge. The People eventually dropped the criminal possession charge and Washington was sentenced to 4–½ to 9 years in prison for criminal sale.

At trial the prosecution had to prove (1) that Starks knowingly sold drugs to Petronella, and (2) that Washington was her accomplice. Under New York law a defendant cannot be found guilty of criminal sale if he obtains drugs merely as a favor for the buyer. Therefore, the prosecution also bore the burden of *disproving* Washington's "agency defense." Washington's agency theory was that he was merely accommodating Starks—that he was doing a favor for a friend. As far as he was concerned the subsequent Starks–Petronella transaction was entirely separate.

After unsuccessful appeals to the state appellate courts, Washington petitioned the federal district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argued that the state trial judge's jury instructions deprived him of a fair trial because the judge effectively vitiated his agency defense theory by committing three errors in the charge. First and foremost, Washington complained that the trial judge charged the jury that he would escape conviction if "he acted as an agent for *Petronella*" (emphasis

added). Washington contended that his defense was that he was *Starks'* agent and that he had nothing at all to do with Petronella. According to Washington, however, the trial judge never raised this possibility to the jury. In addition, Washington argued that the trial court effectively removed from the prosecution the burden of proving accomplice liability and of proving who the "buyer" and "seller" were in the transaction.[1] For instance, the trial judge stated unequivocally that "I have determined as a matter of law that Verenda Starks was an accomplice." Similarly, when questioned by the jury, the judge "defined" Starks as the seller and Petronella as the buyer. Washington maintained that by deciding as a matter of law that he was an *accomplice* of the *seller* Starks, the trial judge effectively eliminated the prosecution's burden of disproving the agency defense.

Judge Curtin denied the petition in an order dated October 30, 1991. He reasoned that although the state court judge did indeed charge the jury incorrectly as to the agency defense, the error did not "so infect[ ] the entire trial that the resulting conviction violated due process."[2] Pursuant to 28 U.S.C. § 2253, we issued a certificate of probable cause on June 3, 1992.

## DISCUSSION

Washington's conviction in the Erie County trial court was affirmed by the Fourth Department of the Appellate Division in a short memorandum decision. *People v. Washington*, 151 A.D.2d 973, 542 N.Y.S.2d

---

**1.** We do not understand Washington to be claiming on appeal that either of these two latter errors, *standing alone*, violated his constitutional rights. Instead, each error allegedly contributed to the vitiation of the agency defense. The single "Question Presented" in appellant's main brief reads in pertinent part as follows: "Did the judge's charge on agency violate Petitioner's Fifth and Fourteenth Amendment rights in directing a finding that vitiated the Petitioner's agency defense?" In any event, we do not believe that either of the two alleged trial errors "'had substantial and injurious effect or influence in determining the jury's verdict,'" *Brecht v. Abrahamson*, — U.S. —, —, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)), and we

would not issue the writ on the basis of either alleged error, standing alone.

**2.** Judge Curtin also ruled that the state court "did not remove the accessory element from the State's proof," primarily because its statement that Starks was an accomplice as a matter of law was aimed only at protecting Washington from being convicted on the uncorroborated testimony of an accomplice. We do not understand Washington to be appealing from this particular ruling. In any event, we concur in Judge Curtin's result, particularly in light of later statements made by the state court judge in the course of his jury charge which made it perfectly clear to the jury that it was up to it to decide the issue of accessorial liability.

419 (4th Dep't 1989). The defendant's application for a certificate granting leave to appeal to the New York Court of Appeals was denied on August 11, 1989. *People v. Washington,* 74 N.Y.2d 821, 546 N.Y.S.2d 579, 545 N.E.2d 893 (1989). The government initially conceded in federal district court and before us that Washington had exhausted his state remedies as required by 28 U.S.C. § 2254. However, in its supplemental brief filed at our behest after oral argument, the government admitted that its concession was erroneous. We agree. We believe that Washington has not given the state courts an adequate opportunity to address the issue he presents to us. Because he has no further recourse in the state courts, we hold that he is procedurally barred from raising his argument in federal court.

### I. *Presentation of Federal Claims to State Courts*

■■■ Washington did not fairly present to the state courts the question whether the trial judge's agency instruction was constitutionally infirm and deprived him of due process of law. *See Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 408, 30 L.Ed.2d 418 (1971) (per curiam). Washington's argument both before the Appellate Division and in his application for leave to appeal to the New York Court of Appeals was that the *evidence was insufficient* to negate his defense that he acted as the agent of the buyer, Starks. While the state courts undoubtedly were alerted to the federal constitutional nature of the claim, there is a marked difference between an insufficiency claim and a claim that an erroneous jury instruction violated due process. While both claims are grounded in the notion that due process is violated unless every element of a crime is proven beyond a reasonable doubt, *see In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the state courts surely could have found that the evidence was sufficient to negate appellant's agency defense without having contemplated whether the jury had been unconstitutionally barred from considering that evidence because of an erroneous instruction. In short, the " 'ultimate question for disposition' " in state court, *Picard v. Connor,* 404 U.S. 270, 277, 92 S.Ct.

509, 513, 30 L.Ed.2d 438 (1971) (quoting *United States ex rel. Kemp v. Pate,* 359 F.2d 749, 751 (7th Cir.1966)), was not the same as the question presented to us.

Washington also argued to the state courts that the trial judge "expressed a predisposition as to appellant's guilt." In our opinion, the crux of this argument was that the trial judge demonstrated bias against Washington and influenced the jury to accept the prosecution's view of accomplice liability and who the "buyer" and "seller" were. Indeed, Washington mimicked the language of his trial counsel whose *only* objection at trial to the jury charge was that the jury "may view the Court as having a predisposition or a decision that each of those things were [sic] true."

Exhibiting a predisposition or bias is simply not the same as improperly removing from the prosecution the burden of disproving the agency defense. The first goes to how the jury *perceives* the facts, the second to whether the jury is permitted to *consider* those facts. Moreover, to the extent that Washington suggested in his state court briefs that the trial judge took from the jury the questions of accomplice liability and who the "buyer" and "seller" were, he utterly failed to link these errors to the vitiation of the agency defense, which is the issue before us. The state appellate courts had no reason to believe that Washington was actually complaining about the agency defense instruction and the Appellate Division did not address that issue in its memorandum opinion.

Consequently, we do not believe Washington has fairly presented to the state courts his constitutional objection to the agency defense instruction. He has neither cited chapter and verse of the Constitution nor satisfied any of the four criteria listed in our opinion in *Daye v. Attorney General of New York,* 696 F.2d 186, 194 (2d Cir.1982) (in banc) (setting forth criteria for determining whether a litigant has fairly apprised the state court of his federal claim). In short, the state courts have not had an opportunity to address the federal claim raised on habeas review and this normally would preclude our review of that claim.

## II. *Procedural Default*

█ As we have already noted, this preclusion is not technically the result of a failure to exhaust state remedies, but is due to a *procedural default.* Washington no longer has the right to raise his claim under New York law either on direct appeal, *see* McKinney's 1993 Revised N.Y.Court Rules § 500.-10(a), or on collateral review. New York's collateral procedures are unavailable because appellant could have raised the claim on direct review but did not. *See* N.Y.Crim.Proc. Law § 440.10(2)(c). Therefore Washington has no further recourse in state court. *See* 28 U.S.C. § 2254(c); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991). Because he failed to raise his claim in state court and no longer may do so, his claim is procedurally defaulted.

█ Generally, a federal writ of habeas corpus will not issue if the petitioner has forfeited his claim in state court through a procedural default, unless he can demonstrate cause and prejudice for the default. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594, *reh'g denied,* 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 163 (1977). In *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), the Supreme Court applied the *Wainwright* rule to a failure to raise a federal claim on direct state appeal. Because state procedural rules in that case, as here, barred any further state review of the claim, the Court held that the claim had been forfeited, and in the absence of a showing of cause and prejudice could not be heard on federal habeas review. *Id.* at 490–91, 106 S.Ct. at 2646–47; *see also Grey,* 933 F.2d at 121. Applying *Murray* to the case at bar, we find no indication in the record of cause for appellant's failure to raise his claim on appeal. Ignorance or inadvertence will not constitute "cause." *See Murray,* 477 U.S. at 491, 106 S.Ct. at 2647.

█ If there has been a "fundamental miscarriage of justice," however, a procedural default may be excused even without a showing of cause and prejudice. *Murray,* 477 U.S. at 495–96, 106 S.Ct. at 2649–50. Such a miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. at 2649. We note that the question is not whether there has been a constitutional violation, even a shockingly obvious one. As the Supreme Court has recently put it in a death penalty case, in order to show a fundamental miscarriage of justice, "one must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner [guilty]." *Sawyer v. Whitley,* — U.S. —, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269, *reh'g denied,* — U.S. —, 113 S.Ct. 21, 120 L.Ed.2d 948 (1992).

█ We do not believe any such showing can be made in this case. Even if we were to hold that the erroneous jury instruction deprived Washington of a fair trial and that indeed he was prejudiced by the error, we cannot say that *no* reasonable juror could have found him guilty had the instruction been correct. We believe that had the question been properly presented to it, a rational jury *could* have found that Washington did not act as Starks' agent. Therefore, there has been no fundamental miscarriage of justice.

Nevertheless, the inquiry does not end here. Unlike in any of the cases cited, the government here failed to raise the procedural default defense. If we are bound by, or may accept the government's initial concession that Washington has fairly presented the state courts with the arguments he raises to us, then we are free to reach the merits. Otherwise, the petition must be denied.

## III. *Prosecution's Failure to Raise the Defense*

█ A procedural default in state court is not a jurisdictional bar in federal court. We are reluctant to hear claims procedurally defaulted in state court for the same basic reasons we prefer not to hear claims that have not been exhausted in state court. *See Coleman v. Thompson,* — U.S. —, —, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640, *reh'g denied,* — U.S. —, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). The principles of comity and federalism require that we abstain in these circumstances out of respect for our

dual court system and in deference to the integrity of the state courts. We have the power to hear the merits of the case but have generally chosen not to exercise it. We must now decide the converse issue: whether we have the authority to limit our obligation to reach the merits by raising the procedural default defense *sua sponte*, and if so, whether it is appropriate in this case to do so.

### A. *Authority to Raise the Defense* Sua Sponte

The government never raised the procedural default question of its own accord. This is not a case where the government *consciously* waived the procedural default defense knowing that it may indeed be valid. When met with these circumstances, the Seventh Circuit held that a federal court may not refuse to accept the conscious waiver. *Henderson v. Thieret,* 859 F.2d 492, 498–99 (7th Cir.1988), *cert. denied,* 490 U.S. 1009, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989). Here the government simply failed to raise the defense because, as it explained in its supplemental brief, it incorrectly deemed that it had no merit. Moreover, even if the government's erroneous concession regarding exhaustion can be taken as a concession regarding procedural default, we believe that where such a concession constitutes merely an innocent error, there is no analytic or policy reason to treat it any differently than a failure to raise the defense at all. Thus, if we have the authority to raise the procedural default defense *sua sponte,* we have the authority to raise it in this case.

We believe that we may raise the procedural default issue *sua sponte.* Principles of comity and federalism bear on the relations between court systems, and those relations will be affected whether or not the litigants have raised the issue themselves. We find support in at least two other circuits that have recently handed down decisions holding that the federal courts have the authority to raise the procedural default defense *sua sponte.* See *Hardiman v. Reynolds,* 971 F.2d 500, 502–05 (10th Cir.1992); *Hull v. Freeman,* 932 F.2d 159, 164 & n. 4 (3d Cir.1991). We are unaware of any circuit that has taken a contrary view. In addition, the Supreme Court has held analogously that the federal courts have the authority to entertain a belatedly raised exhaustion defense. *Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987).[3] We are persuaded that we *may* raise the procedural default defense *sua sponte.* The question becomes, then, when is it *appropriate* to do so.

### B. *Propriety of Raising the Defense* Sua Sponte

We have found no direct guidance from the Supreme Court as to when we ought to raise the issue *sua sponte.* Nor have the parties provided us with a coherent theory. We believe, however, that the analysis in *Granberry* easily can and should be adapted to fit the procedural default context. Exhaustion and procedural default are related concepts and stem from the same policy concerns.

In *Granberry,* the State of Illinois successfully moved in federal district court to dismiss petitioner's habeas complaint for failure to state a claim. For the first time on appeal, the state argued that petitioner had not exhausted his state remedies. Petitioner responded that by failing to raise exhaustion in the district court the state had waived the defense. The Court of Appeals disagreed and ordered the case dismissed on the ground of nonexhaustion.

The Supreme Court reversed and remanded. Justice Stevens wrote: "[An appellate] court should determine whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim." 481 U.S. at 134, 107 S.Ct. at 1675. In giving content to this mandate, the Court offered

---

**3.** That *Granberry* addressed a belatedly raised defense rather than a defense that was not raised at all does not destroy the analogy. As the Tenth Circuit recognized, the question in both situations is the same: "Is the defense sufficiently important to warrant consideration even though the government failed *properly* to raise it?" *Hardiman v. Reynolds,* 971 F.2d 500, 504 n. 6 (10th Cir.1992) (emphasis added).

several examples. It suggested that a court presented with a case involving an unresolved question of fact or state law should normally insist on complete exhaustion, while a court presented with a clearly unmeritorious federal claim should reach the merits (and dismiss) without requiring exhaustion. *Id.* at 134–35, 107 S.Ct. at 1675–76. While we see no reason why these examples should not in general apply to procedural default cases, they do not bear on the particular situation at hand.

■■■ Aside from cases in which the prosecutor fails to raise the nonexhaustion defense solely to obtain a tactical advantage,[4] the decisions handed down by courts of appeals based on the *Granberry* formula generally fall into one of two categories. First, there are those cases in which overlooking nonexhaustion actively serves the principles of comity and federalism. Thus, in *Davis v. Lansing,* 851 F.2d 72, 76 (2d Cir.1988), we excused nonexhaustion in order to rule that the federal courts were obliged to abstain from hearing the merits of the case under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The state courts could not be offended by this ruling, and reaching the abstention issue helped shape the ongoing relationship between the state and federal courts. *See also Evans v. Court of Common Pleas,* 959 F.2d 1227, 1233 (3d Cir.1992) (excusing nonexhaustion in order to determine whether interlocutory habeas review was available at all to petitioner), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1071, 122 L.Ed.2d 498 (1993); *Keller v. Petsock,* 853 F.2d 1122, 1128–29 (3d Cir.1988) (excusing nonexhaustion in order to rule that courts may not consider claims involving intra-jury influences). We believe that by analogy, if a federal court can dispose of a habeas matter without reaching the merits, it should not be barred from doing so by a procedural default in state court, at least where the prosecutor has failed to raise that defense. This comports with the principles of comity and federalism and promotes judicial efficiency. Once

again, however, this exception does not apply to the case at bar.

■■■ The second line of cases seems to build on the statutory exception permitting nonexhaustion where recourse to state remedies is futile. *See* 28 U.S.C. § 2254(b). Thus, in *Workman v. Tate,* 957 F.2d 1339, 1344 (6th Cir.1992), the court reached the merits because the failure to exhaust was a result of inordinate delay (more than three years) in the state courts. *See also Chitwood v. Dowd,* 889 F.2d 781, 784–85 (8th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990) (excusing exhaustion because state officials and courts consistently delayed determination of petitioner's challenge to the length of his sentence). The principle gleaned from this line of cases is that where nonexhaustion is primarily the fault of the state court system itself, comity and federalism cannot require blind deference. We will allow the state courts every opportunity to address legal objections to a state conviction, but when the state courts refuse to avail themselves of those opportunities we will not sit back while a possibly innocent person languishes in prison. These concerns are equally applicable in the procedural default context and find some content already in the "cause and prejudice" test. In any event, we see no indication that the state courts are at all responsible for Washington's procedural default.

■■■ Because the case before us does not fit into either of the two general categories, we turn to the *Granberry* Court's final example which is grounded in the notion of miscarriage of justice. Justice Stevens wrote, referring to *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541, *reh'g denied,* 343 U.S. 937, 72 S.Ct. 768, 96 L.Ed. 1344 (1952), that if "it is evident that a miscarriage of justice has occurred, it may ... be appropriate for the court of appeals to hold that the nonexhaustion defense has been waived in order to avoid unnecessary delay in granting relief that is plainly warranted." 481 U.S. at 135, 107 S.Ct. at 1675. If we were to inter-

---

4. We need not consider cases involving prosecutorial tactics because in the procedural default context a prosecutor will rarely benefit from holding the procedural default defense in re-

serve. In any event, it is clear that in the present case the prosecution's concession or failure to raise the defense was not a strategic maneuver.

pret "miscarriage of justice" in this context along the same lines as the Supreme Court's interpretation in *Sawyer* ("actual innocence"), the exception would be redundant: in procedural default cases a miscarriage of justice as defined in *Sawyer* permits a federal habeas court to reach the merits whether or not the government has raised the defense. However, we are persuaded that in this context "miscarriage of justice" is meant more liberally than in the *Sawyer* context.

The *Granberry* Court relied on the *Frisbie* case as its sole example of a "miscarriage of justice." In *Frisbie,* the circumstances were undoubtedly exceptional: the prisoner had been beaten and kidnapped in Illinois by Michigan police officers in violation of the federal anti-kidnapping statute. Thus, the federal question raised did not go merely to the legality of the conviction or to a procedure within the trial, but rather challenged the legality of the trial itself. *Collins v. Frisbie,* 189 F.2d 464, 468 (6th Cir.1951), *rev'd on other grounds,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541, *reh'g denied,* 343 U.S. 937, 72 S.Ct. 768, 96 L.Ed. 1344 (1952). In any event, the *Frisbie* Court did not require actual innocence as the *Sawyer* Court did.

Even if we were to hold that *Sawyer* modified the definition of "miscarriage of justice" in the *Granberry* context, we would still be convinced that it should be defined more loosely in our context. Unlike in exhaustion cases, if we decline to reach the merits in a procedural default case, the defendant has no further recourse to either state or federal relief. Justice dictates that we act with greater leniency when determining whether to shut off a defendant's last avenue of hope.

On the other hand, we cannot define the exception so broadly that it swallows the rule. Thus, for instance, a miscarriage of justice must be more than simply a prejudicial federal statutory or constitutional error because this is *always* required before we will issue a writ of habeas corpus. Nor do we think that a "clear violation" of federal statutory or constitutional rules constitutes a principled definition. An innocent person wrongly convicted because of federal statutory or constitutional error has not undergone worse treatment merely because the whole

world can spot the error, and not just the legally sophisticated. Error rises to the level of "miscarriage of justice" not because it is conspicuous, but because of the nature or seriousness of its *effect.*

We believe there are two categories of circumstances that may be properly labelled "miscarriages of justice" in this context. These categories are consistent with the *Granberry* principles and relevant case law and strike a just balance between fairness owed to the individual defendant on the one hand and the deference owed to state courts on the other.

The first category involves a federal violation which challenges the validity of the trial itself. The most obvious example is the *Frisbie* case described above. Another example might involve the Double Jeopardy Clause. It is doubtful that these types of situations implicate comity or federalism at all because under federal law the state courts never obtained the authority to conduct a trial. In a sense the state courts would be acting as extralegal tribunals, and we are far less hesitant to reach the merits in this situation.

The second category involves federal violations that were motivated by malice and not caused by mere inadvertence or poor judgment. A state court system that purposefully and unjustifiably violates a defendant's federal rights cannot be entitled to the same deference as a system that makes only innocent mistakes. When the government fails to raise a procedural default defense, we will reach the merits if the petitioner can show that conscious malice by a state court official caused a federal violation.

■ The case at bar does not fall within the first category because Washington challenges only his conviction, not the validity of the trial itself. Nor do we believe it belongs in the second category. We need not decide the evidentiary standard for the second category today because at a minimum, there must be *some* evidence on the record *aside from the federal violation itself* indicating that the state judge intentionally violated appellant's federal rights—and here there is none.

We conclude from all of this that Washington has procedurally defaulted his constitutional objection to the state judge's agency defense instruction, and he may not now raise that issue before us.

## CONCLUSION

Washington has procedurally defaulted his federal claim regarding the agency defense and can show no cause for the default. Although the government failed to raise the issue, we have the authority to raise it *sua sponte*. Following the analysis in *Granberry*, we believe that the principles of comity and federalism dictate that we raise the defense except in four circumstances: (1) where comity and federalism are not implicated or where they are better served by reaching the merits; (2) where the state is itself at fault for the procedural default; (3) where the alleged federal violation challenges the validity of the state trial itself; or (4) where the alleged federal violation was motivated by malice. Because none of these exceptions applies to Washington's case, we will not excuse his procedural default.

Accordingly, the judgment of the district court is affirmed.

KEARSE, Circuit Judge, concurring:

I concur in the judgment. While I agree that Washington did not raise his present argument in his appeal to the state Appellate Division, I would affirm principally because Washington did not adequately preserve the argument by objecting even in the state trial court. Thus, in my view, the procedural default that bars our consideration of Washington's habeas contentions occurred at the trial level rather than at the appellate level.

Washington's principal defense at trial was that he had been acting solely as an agent for his friend, Verenda Starks, who had asked him to purchase drugs. Under New York law, " '[one] who acts solely as the agent of the buyer cannot be convicted of the crime of selling narcotics.' " *People v. Lam Lek Chong*, 45 N.Y.2d 64, 73, 407 N.Y.S.2d 674, 679, 379 N.E.2d 200, 205 *cert. denied*, 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978). "Thus, where there is some reasonable view of the evidence which lends support to the claim that the defendant acted as an instrumentality of the buyer, upon a timely request, the court should instruct the jury on the agency defense." *People v. Feldman*, 50 N.Y.2d 500, 503–04, 429 N.Y.S.2d 602, 604, 407 N.E.2d 448, 449 (1980) (per curiam).

Accordingly, the trial court instructed the jury as follows:

The law does not punish a buyer who buys drugs; therefore, one who acts solely in the capacity of an agent of the buyer cannot be convicted under the law pursuant to the Penal Law of the crime of the criminal sale of a controlled substance in the third degree or with the possession with intent to sell. One who acts solely in the capacity of claiming he is an agent for the buyer, cannot be found guilty of buying.

(Trial Transcript May 12, 1987 ("Tr."), at 83.) The court suggested to the jury factors it might consider and gave it examples of ways in which it might determine whether a person was an agent for a buyer. The court also instructed the jury that the burden was on the prosecution to prove beyond a reasonable doubt that Washington had not acted as the agent of the buyer of the narcotics in question. The court never mentioned Starks by name as the person for whom Washington contended he acted as agent. Washington's attorney, asked whether he had any objections to the charge or any additions to request, responded in the negative.

After several hours of deliberation, the jury returned to ask for elucidation of the terms "seller," "buyer," and "agent." The court instructed the jury that the terms "seller" and "buyer" had their ordinary meanings (Tr. 95); that "the Prosecution's contention . . . [was] that both Starks and Washington in this case were sellers of heroin to Petronella" (Tr. 98); and that "[i]n this case, the buyer, of course, was the undercover police officer, who you learned was Joseph Petronella" (Tr. 95). As to the issue of agency, the court stated:

[I]t is the defendant's position: That he was not a seller of the drugs in this case to Petronella; that he acted *as an agent for Petronella*, the buyer in this case; that he

acted as an agent to accommodate, as a friendly gesture; that—and, in fact, if he was an accommodating party, doing a favor for someone that he had nothing to gain, no benefit to him. It is their position—it is the defense's position, that therefore he should be relieved of any liability.

(Tr. 98–99 (emphasis added).) Though the language italicized in this supplemental instruction evinced a misunderstanding of Washington's position, Washington did not offer any correction or ask the court to advise the jury that in fact his position was that he had acted as an agent not for Petronella but for Starks. Rather, Washington's limited objection to the court's supplemental instructions was simply as follows:

I don't have any statements to make in regards to the jury's questions that I want to make on the record. However, to preserve it, for the record, I would like to state that the defense takes exception to the Court's statement to the jury that the evidence in this case tends to indicate that Starks was a seller. I would also take exception to the Court's statement, for the record, that the—to the jury that the prosecution is characterizing Washington as a seller for both of the reasons that the jury may gain—may view the Court as having a predisposition or a decision that each of those things were [sic] true.

(Tr. 99–100.)

In response to this stated objection, the court said it would "balance" its presentation, and it thereupon essentially restated its earlier instruction as to the ways in which the jury could determine whether a person was an agent for a buyer. Again Washington did not inform the court that his position was that he had acted as the agent of Starks, not of Petronella, or ask the court to so instruct the jury.

In sum, though Washington contends in his present habeas corpus petition that the trial court's instructions were erroneous because they did not permit the jury to consider his contention that Starks rather than Petronella was the buyer for whom Washington acted as an agent, the only objection he made to the trial court was that that court had characterized the prosecution's conten-

tions and evidence (a) that Washington was a seller, and (b) that Starks was a seller, in a way that suggested that the court had decided "that each of those things were [sic] true." Thus, not only did Washington fail to make his present argument in his direct appeal to the Appellate Division, he also failed to advise the trial court that this was the gist of his objection. Had the present objection been made to the trial court, the court could easily have corrected its error.

Since the objection was not made in the trial court, it is unlikely that the state appellate court would have entertained it even if Washington had raised it in his state-court appeal. See N.Y.Crim.Pro.L. § 470.05(2) (McKinney Supp.1993) (defendant normally must object to a jury instruction at trial in order to preserve the issue for appellate review); Taylor v. Harris, 640 F.2d 1, 2 (2d Cir.) (per curiam) ("It is well settled in New York that failure to object to an erroneous charge constitutes a waiver precluding review."), cert. denied, 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981); People v. Argibay, 45 N.Y.2d 45, 55, 407 N.Y.S.2d 664, 669, 379 N.E.2d 191, 195 (per curiam), cert. denied, 439 U.S. 930, 99 S.Ct. 317, 58 L.Ed.2d 323 (1978). Accordingly, I agree that the habeas petition was barred by procedural default.

OAKES, Circuit Judge, dissenting:

In this case the only defense, and one that was valid in law, was that Washington was the agent of a buyer (Verenda Starks, who was buying the drugs from a drug house on behalf of Petronella) and therefore he could not be guilty of the sale of a controlled substance. In a supplemental instruction responding to jury questions, the trial judge misrepresented the defense and instructed the jury that Washington was a seller, and that Washington claimed to be the agent of the undercover police officer (Petronella) who set up Starks in the operation for which Washington was prosecuted. I believe the charge vitiated Washington's agency defense and thereby lowered the state's burden of proof beyond a reasonable doubt as to all elements of a narcotics sale. If I am correct, this is a violation of the Fifth and Fourteenth

Amendments as interpreted in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *Sullivan v. Louisiana*, — U.S. —, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). *See also Mullaney v. Wilbur*, 421 U.S. 684, 697–701, 95 S.Ct. 1881, 1888–91, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970).

Judge Meskill's opinion holds that Washington did not raise his agency instruction due process claim before the state appellate courts and therefore his claim is procedurally defaulted. This decision is made unusual by the fact that the state conceded the procedural default issue until this court raised the question *sua sponte*. Judge Kearse's opinion argues that procedural default occurred at the trial level.

Judge Meskill contends that a court of appeals may raise a procedural default defense *sua sponte* where the state has conceded the issue, so long as the concession is the result of an innocent error rather than a deliberate tactical decision. Further, citing *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) and *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), Judge Meskill argues that a court of appeals should raise the procedural default defense *sua sponte* unless the federal court may "dispose of a habeas matter without reaching the merits," Opinion at 1449, or "where nonexhaustion is primarily the fault of the state court system itself." Opinion at 1449.

Nonetheless, as Judge Meskill's opinion acknowledges, a court of appeals should consider a procedural default claim waived if it is evident that a "miscarriage of justice" has occurred. Judge Meskill appreciates that "miscarriage of justice" should be defined more loosely in this context, where the state has conceded the exhaustion question, than in either the typical procedural default context, in which a petitioner must demonstrate "actual innocence," *Murray*, 477 U.S. at 497, 106 S.Ct. at 2650 or in the *Granberry* nonexhaustion situation. Opinion at 1450. Accordingly, Judge Meskill divides "miscarriage of justice" into two categories: first, cases involving "a federal violation which chal-

lenges the validity of the trial itself," Opinion at 18 (such as Double Jeopardy claims); and second, cases involving "federal violations that were motivated by malice and not caused by mere inadvertence or poor judgment." *Id.* Judge Meskill concludes that Washington's case falls within neither of these categories; since Washington challenges the validity of his conviction and not the validity of the trial itself and there is no evidence "*aside from the federal violation itself* indicating that the state judge intentionally violated [Washington's] rights." Opinion at 18–19.

I have two disagreements with the opinion. First, I think that it fails to account for an important category of cases in which it is inappropriate for a court of appeals to raise a procedural default defense *sua sponte*. Judge Meskill derives his "miscarriage of justice" category from the *Granberry* Court's statement that "if a full trial has been held in the district court and it is evident that a miscarriage of justice has occurred, it may also be appropriate for the court of appeals to hold that the nonexhaustion defense has been waived in order to avoid unnecessary delay in granting relief that is plainly warranted." 481 U.S. at 135, 107 S.Ct. at 1675. I believe that this language supports a broader reading of the "miscarriage of justice" category than provided in Judge Meskill's opinion. In particular, "miscarriage of justice" should include cases where the record is well developed and the merits strongly support the petitioner's claim.

*Granberry* provides for a broader interpretation of "miscarriage of justice" than Judge Meskill's opinion suggests. *Granberry* requires a court of appeals to determine "whether the interests of justice would be better served by addressing the merits of the habeas petition or by requiring additional state proceedings before doing so." *Granberry*, 481 U.S. at 136, 107 S.Ct. at 1676. As Judge Meskill's opinion recognizes, a defendant in a procedural default situation deserves even greater consideration because he or she has no further recourse to either state or federal relief. Nonetheless, Judge Meskill takes the limited view that the "miscarriage of justice" category applies only where state

courts act as "extralegal tribunals" or where they act with malice. Judge Meskill seems to believe that it would be inappropriate to find a "miscarriage of justice" based on an analysis of the merits because "[a]n innocent man wrongly convicted because of a federal statutory or constitutional error has not undergone worse treatment merely because the whole world can spot the error, and not just the legally sophisticated." Opinion at 1450.

*Granberry* itself, in my view, contradicts the opinion's position that the conspicuousness of an error is unrelated to whether a court of appeals should raise a procedural default defense *sua sponte.* The *Granberry* passage concerning "miscarriage of justice" cited above states that a nonexhaustion defense may be considered waived "in order to avoid unnecessary delay in granting relief that is *plainly* warranted." 481 U.S. at 135, 107 S.Ct. at 1675 (emphasis added). Evidently, the *Granberry* Court thought that the strength of a petitioner's case was relevant to the question whether the interests of justice would be better served by addressing the merits of a habeas petition.

My disagreement with Judge Meskill's opinion is not limited to his handling of the procedural bar—the question whether we should consider Washington's claims on the merits—but extends also to his treatment of the merits themselves. Judge Meskill contends that the decision to raise the procedural default defense *sua sponte* alleviates the need to evaluate Washington's claims on the merits. Opinion at 1448–49. Despite this claim, his opinion takes a position on the merits in footnote 1, stating that two of the three alleged trial errors standing alone did not have " ' "substantial and injurious effect or influence in determining the jury's verdict," ' " and we would not issue the writ on the basis of either alleged error, standing alone." (Citations omitted.)

As the opinion notes, Washington alleges that three errors in the trial instructions to the jury deprived him of a fair trial and violated his due process rights. First, the trial judge charged the jury that Washington would escape conviction if "he acted as an agent for Petronella." (Washington's defense was based on the theory that he was

Starks' agent and had nothing to do with Petronella). Second, the trial court removed from the prosecution the burden of proving accomplice liability, stating that "as a matter of law ... Verenda Starks was an accomplice." Third, when asked by the jury to define and differentiate the terms "buyer" and "seller," the court, instead, erroneously told the jury who it believed the buyer and seller to be.

Although Judge Meskill may be accurate in saying that the last two of these errors standing alone are insufficient to justify granting a writ of habeas, as a package, the trial errors were serious and should be enough to meet the merits-based "miscarriage of justice" category I believe the Supreme Court cases establish. My view is strengthened by the recent Supreme Court decision in *Sullivan v. Louisiana,* — U.S. ——, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The *Sullivan* Court found that a constitutionally defective jury instruction on the "reasonable doubt" standard represented a structural defect in the trial itself and, therefore, could not be reviewed under the harmless error test. Likewise, the trial errors committed in this case effectively took from the jury the task of determining whether the state had proved all elements of the crime. As a result, Washington's petition for a writ of habeas corpus should be granted.

I turn to Judge Kearse's opinion that there was procedural default at the trial level, for failure properly to object to the trial court's erroneous supplemental instruction that it was the defense's position that Washington acted as an agent of Petronella, the buyer. Defense counsel objected both to the court's statement that the evidence indicated that Starks was a seller and to the court's characterization of Starks' and Washington's roles as sellers. While the objections could have been more pointed, the court was certainly aware of the basic defense that Washington was the agent of the *buyer,* Starks, when she bought from the drug house, and not of Starks as seller to Petronella. The court stated to defense counsel:

THE COURT: As far as the charge is concerned, you have already indicated off the record that you are requesting a charge on

the defense agency—agency defense; is that correct?

MR. HAHN: Yes, Your Honor.

THE COURT: I will be so charging....

Trial Transcript, Petitioner's Appendix at 75. Subsequently, defense counsel stated:

Your Honor, the Court has indicated that it will charge on agency, and I have a proposed charge which I would like to tender to the Court on agency. It may be the same one. It may be similar to the one the Court is going to use. If, by the facts, the jury does not find that my client was an agent of the *buyer* and acquits on criminal sale, then....

Appendix at 79 (emphasis added). The court in its original charge to the jury did give the agency instruction that "the Defendant Washington ... claims that during the transaction in this case that he was acting as the agent of the buyer, alleging that he was the agent of the buyer." Appendix at 95.

The supplemental instructions and objections thereto must be read in light of these instructions and what followed, including the further instruction: "How do you decide whether or not the People have proved beyond a reasonable doubt to your satisfaction that the defendant was not acting solely as a [sic] an agent of the buyer?" Appendix at 97. The supplemental instructions, by stating that the evidence indicated that Starks was a seller and characterizing both Starks' and Washington's roles as sellers, wiped out the sole defense and belied the original charge. I do not think that defense counsel, confronted suddenly with such a supplemental charge, can be required to frame his objections with the technical expertise of counsel who has been handed a written charge in advance as required by, say, the federal rules.

In my view, the supplemental charge blew the defense away by depriving the jury of the option of selecting Starks as the buyer. Because I view the objections *taken in context* as sufficient, I would proceed to the merits for the reasons stated above, in my discussion of Judge Meskill's opinion. Reaching the merits, I would reverse. Because both of my colleagues' opinions *sua sponte* raise unnecessary prudential barriers in a case where

the defendant was deprived of fundamental fairness by the trial court's supplemental charge, I dissent.