■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM TUCKER, Appellant. [733 NYS2d 39] —Judgment, Supreme Court, New York County (Bruce Allen, J.), rendered February 22, 2000, convicting defendant, after a jury trial, of criminal sale of a controlled substance in the third degree and sentencing him to an indeterminate term of 1 to 3 years in prison, unanimously reversed, on the facts, and the indictment against him dismissed pursuant to CPL 470.20 (5).

Defendant was convicted after a jury trial of criminal sale of a controlled substance in the third degree and sentenced to an indeterminate term of 1 to 3 years in prison. The issue before us is whether that conviction is against the weight of the evidence.

The People's evidence showed that, on January 16, 1999, at around 1 in the afternoon, an undercover policewoman approached defendant, who was standing on the corner of 129th Street and Fifth Avenue, near where he resided, and asked him if "anybody [was] working." Defendant answered yes, and said that they were up the block toward Lenox Avenue. He offered to take her there, suggesting to the undercover that they get together after the buy. To discourage him, the undercover said she had to meet her boyfriend and that the drugs were for him. When they reached Lenox Avenue, the undercover and defendant approached Allen Epps. Defendant told Epps that the undercover was "looking" and asked if "they" were "out." Epps called Sharon Griffin over, and Griffin asked the undercover what she wanted. The undercover said she wanted two "nicks," or two vials of crack. Griffin told her and defendant to go with her, and the three of them walked down the block to a building on West 129th Street, where they met Simitha Curry. Griffin told Curry to "hook us up" and said the undercover wanted two nicks. Curry told them to wait because she thought there were cops down the block. While they waited, defendant continued to try to persuade the undercover to get together with him after she bought the drugs. After a few minutes, Curry went into the building. When she came back out, she handed several vials of crack cocaine to Griffin, who gave two of them to the undercover in exchange for $10 of pre-recorded buy money. The undercover put the two vials in her pocket and she and defendant walked back to Lenox Avenue and turned

northward. They encountered another undercover police officer, one of the undercover policewoman's "ghosts," between 130th and 131st Streets. In an effort to get rid of defendant, the undercover pretended her ghost was her boyfriend and told him, "I have your stuff." The ghost said, "Let's get out of here," and he and the undercover walked away from defendant, who was apprehended a short while later on 131st Street.

Defendant testified that he was on his way home from his mother's house on West 138th Street, waiting to cross Fifth Avenue at 129th Street, when the undercover policewoman spoke to him. He had never seen her before, but he thought, "She looks good, how can I turn this to my advantage?" Not to put too fine a point on it, he was "trying to get some sex, that is really the bottom line. You know, this woman looked good, she was flirting with me, started talking to me and I just went along with her." Defendant walked up the block with the undercover instead of waiting for her on the corner because he did not want her to "get away from" him. When he suggested getting together after the buy, the undercover said, "That would be nice." When he asked her where they could go afterwards, she said her cousin lived on East 131st Street. The undercover admitted this.

The jury rejected defendant's agency defense and found that he acted in concert with Epps, Griffin and Curry to sell crack cocaine to the undercover. The undercover testified that she believed defendant could have been both "hitting" on her and trying to sell her drugs, and the jury may have come to the same conclusion. But, having weighed " 'the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony,' " we find that the jury's verdict is against the weight of the evidence (*People v Bleakley*, 69 NY2d 490, 495 [citation omitted]). Considering the nature and extent of the relationship between defendant and the undercover, that it was the undercover, not defendant, who suggested the purchase, that defendant had no other drug dealings with the undercover or any other buyer or seller, and that defendant did not profit, or stand to profit, from the transaction (*see, People v Lam Lek Chong*, 45 NY2d 64, 75, *cert denied* 439 US 935), it is clear that defendant was acting to "procure what the [undercover] want[ed] because [she] * * * asked him to do so, but not out of any independent desire or inclination to promote the transaction" (*People v Argibay*, 45 NY2d 45, 53-54, *cert denied sub nom. Hahn-DiGuiseppe v New York*, 439 US 930). Defendant had "no direct interest in the contraband being sold" (*People v Roche*, 45 NY2d 78, 85,

*cert denied* 439 US 958). He was not associated with the drug sellers; he only knew where they might be found and he hoped to parlay that knowledge into a sexual encounter with the undercover.

Defendant not only was not the one who suggested the purchase, but he also demonstrated no interest in it by, for example, asking the undercover what she wanted or how much she was willing to spend. He only offered to walk her up the block to where she might find someone selling, and from then on his conversation with her was about one thing and one thing only: having sex with her after she made the purchase. The undercover herself testified that it was possible to buy drugs on nearly any corner of Lenox Avenue between 127th Street and roughly 140th Street and that she assumed residents of the neighborhood knew this. Defendant had lived in the same apartment on Fifth Avenue at 127th Street, two blocks from where the undercover stopped him, for 40 of his 43 years. He had never been convicted of a crime and was not involved in any kind of drug activity, but he knew that drugs were sold in the neighborhood on Lenox Avenue and parts of Fifth Avenue and, like most residents of that neighborhood, he knew that a person who asked, "Is anyone working?" was looking for drugs. Unlike a steerer for a drug seller, however, defendant did not know whether "they" were "out," and had to ask. And unlike a steerer, who would not have abandoned his post on the street for so long, defendant stayed with the undercover from the moment she first approached him until after she had obtained the drugs, and he was still at her side when they ran into her ghost a couple of blocks away from the site of the purchase. Defendant only gave up hope of having sex with the undercover, and reluctantly left her, when the two officers together made it clear that he would not get what he wanted. In light of all the evidence in this case, the proof that defendant understood that the undercover was interested in buying drugs, that he wanted to help her, and that he may have recognized a neighborhood drug seller does not warrant the inference that he was a "steerer" for the drug sellers or participated in the sale in a commercial sense. Concur—Sullivan, P. J., Mazzarelli, Ellerin, Wallach and Lerner, JJ.